UNITED STATES ex rel. Roger COLLINS, Petitioner,

v.

George WELBORN, Warden, Menard Correctional Center, Respondent.

UNITED STATES ex rel. William BRACY, Petitioner,

v.

Richard GRAMLEY, Warden, Pontiac Correctional Center, Respondent.

Nos. 93 C 5282, 93 C 5328.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 24, 1994.

Opinion Denying Motions to Alter or Amend Nov. 4, 1994.

---

Robert H. Farley, Jr., Robert H. Farley, Jr., Ltd., Naperville, IL, Stephen E. Eberhardt, Chicago, IL, for petitioner Collins.

Steven J. Zick, Terence Madsen, Chicago, IL, for respondent Welborn.

Gilbert H. Levy, Seattle, WA, Martin Carlson, Chicago, IL, for petitioner Bracy.

Terence Madsen, IL Atty. Gen. Office, Chicago, IL, for respondent Gramley.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

Roger Collins and William Bracy[1] were found guilty of armed robbery, aggravated kidnapping, and the murders of Frederick Lacey, R.C. Pettigrew, and Richard Holliman in a joint, jury trial in the Circuit Court of Cook County, Illinois. The offenses were committed in 1980. Following a two-staged sentencing hearing, Collins and Bracy were both sentenced to death on the murder convictions. Each was also sentenced to concurrent terms of 60 years' incarceration on the armed robbery and aggravated kidnapping charges. On appeal, the kidnapping sentences were each reduced to 30 years. All the convictions were affirmed as were the sentences of death. *People v. Collins*, 106 Ill.2d 237, 87 Ill.Dec. 910, 478 N.E.2d 267 (*"Collins I"*), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). Post-conviction relief was denied by the trial court and that denial was affirmed. *People v. Collins*, 153 Ill.2d 130, 180 Ill.Dec. 60, 606 N.E.2d 1137 (1992) (*"Collins II"*), *cert. denied*, — U.S. —, —, 113 S.Ct. 2355, 2356, 124 L.Ed.2d 263, 264 (1993). Collins and Bracy then filed separate federal habeas corpus petitions raising a number of claims. The two cases were consolidated. Presently pending are respondents' motions to deny the two petitions.[2]

### TABLE OF CONTENTS

I. FACTUAL BACKGROUND ................................................959
II. EXHAUSTION, WAIVER AND DEFAULT ...............................963
III. GROUNDS ASSERTED FOR RELIEF ...................................967
 A. Exclusion of African–Americans from Jury ..........................967
 B. Nellum's Testimony—Discovery and a Hearing .......................968
 C. Prosecutorial Misconduct ........................................970
 1. Waiver ...................................................970
 2. Standard .................................................970
 3. During Presentation of Evidence ............................971
 4. Closing Arguments ........................................972
 5. Sentencing Phase Arguments ...............................976
 D. Sufficiency of Evidence ..........................................978
 1. Murder ..................................................978
 2. Armed Robbery ...........................................978

**1.** The spelling contained in the present petition will be used. The state court record, however, spells his name "Bracey."

**2.** In one of his supplemental petitions, Collins expressly adopts the arguments of Bracy. Where applicable, the arguments of one petitioner will also be considered as to the other petitioner. Essentially no restriction was placed on petitioners' opportunity to brief their claims. Leave to file 100–page briefs was granted.

E. Illegal Search.............................................980
F. A Judge's Wife on Jury—Discovery and a Hearing......................981
G. Ineffective Assistance of Counsel....................................985
H. Death Qualified Jurors..........................................986
I. Denial of Continuance for Sentencing Hearing..........................986
J. Death Penalty Instructions......................................989
K. Death Penalty Statute Unconstitutional..............................990
L. Trial by Judges who accepted Bribes, Discovery.......................990
M. Fabricated Rope Evidence.........................................991
N. Severance.....................................................991
O. Nowell Impeachment Evidence....................................991
P. Brady Claim Related to Nellum...:................................992
Q. Punishment Alternatives and Dangerousness...........................992
R. Involuntary Confession...........................................993
S. Impeachment with Silence.........................................993
T. Loss of the Common Law Record.................................993

## I. FACTUAL BACKGROUND

*Collins I* summarizes the facts:

"On November 12, 1980, sometime after 10 p.m., Frederick Lacey, R.D. Pettigrew and Richard Holliman were taken from apartment 206 at 2240 South State Street in Chicago, placed in a red Oldsmobile, and driven to a viaduct at Roosevelt Road and Clark Street, where they were shot to death. Police officers investigating at the scene found Lacey lying on the ground on the driver's side of the automobile. Pettigrew was lying partially under the right front bumper with pieces of rope and cloth tied around his right wrists. Three expended shotgun shells were found near his body. Holliman was discovered in the back seat, his hands bound with cloth. The record shows that Lacey had been shot in the back of the head. Pettigrew, in addition to being shot in the face, chest and leg, had four shotgun wounds in his back. Holliman had been shot three times in the chest and once in the back of the neck.

"The chief prosecution witness was Morris Nellum, who admittedly took part in the crimes. To secure his testimony, the State agreed to recommend a sentence of three years in protective custody in exchange for Nellum's guilty plea to three counts of concealing a homicidal death. The State also agreed to relocate his family.

"As to the events which occurred on the night of November 12, 1980, Nellum testified as follows. He was with his girlfriend, Regina Parker, at her apartment at 2222 South State Street. At approximately 9:30 p.m., Collins came to the apartment and asked him to go to apartment 206 at 2240 South State, saying he had something he wanted Nellum to take care of. Nellum went to that location, arriving approximately 10 minutes later. In one of the bedrooms he observed Collins, Bracey, Hooper, and three men he did not recognize. Two of the men, later identified as Pettigrew and Holliman, were on the bed with their hands bound. The third, later identified as Lacey, was standing at the side of the bed. Collins asked Nellum to drive his (Collins') brown Cadillac to Roosevelt Road and Clark Street because '[Collins] was going to drop some people off, leave them tied up and he wanted me to pick him up.' Nellum took Collins' keys and went to the parking lot outside the building where Collins' Cadillac was parked. He observed Collins, wearing a wide-brim hat, Bracey, Hooper, and the three victims emerge from the building and walk to the red Oldsmobile. The three victims were placed in the rear seat; Collins and Hooper got in the front seat, with Collins driving. Bracey meanwhile went to his own automobile, which was parked nearby. After the two vehicles departed, Nellum waited a few minutes as instructed, and then followed. As he approached the viaduct at Roosevelt Road and Clark Street, he heard a series of shots. Immediately thereafter, he saw Bracey, carrying a sawed-off shotgun, and Hooper run to Bracey's automobile. Collins got in his own car alongside Nellum. As they sped from the scene, Collins said: 'That damn Hooper. I told him to wait until—I wanted to use the shotgun because they can't trace the shotgun, but he used the gun in-

stead.' According to Nellum, the two vehicles returned to the parking lot at 2240 South State, where Bracey gave him $125 and told him 'Just be cool.' Nellum then drove with Collins to 31st Street and Lake Michigan, where Collins threw two handguns into the lake. Nellum identified a .38–caliber Charter Arms revolver and a .357 Rigueur revolver as the weapons that were thrown in the lake.

"On cross-examination Nellum testified that he did not know the reason for the killings but that he went along for a 'piece of the action.' He also testified that about two months after the murders Hooper told him that $1,800 had been taken from the victims. His credibility was weakened by his admission that he lies when he has to, although he stated that his testimony and statements to the police had been truthful. Yet, he admitted he lied to the police concerning the location of the two handguns. Following his arrest, Nellum denied any knowledge of the whereabouts of the weapons. Three weeks prior to trial, however, he directed the authorities to 31st Street and Lake Michigan, where the guns were recovered by divers. Nellum also testified that he decided to cooperate after prosecutors informed him they would not charge him with murder, but would instead recommend a three-year sentence in exchange for his guilty plea to three counts of concealing a homicidal death.

"Under further cross-examination, Nellum denied knowing the victim Lacey and said he could not recall ever having his picture taken with him. The defendants, however, introduced into evidence a series of photographs taken in August of 1980 which showed Nellum and Lacey together with a number of other individuals.

"Daretha Redmond testified that she lived in a first-floor apartment at 2240 South State. Sometime after 10 p.m. on the night of the murders, she saw a group of about five men, two of whom appeared to be tied, walk past her living room window. Approximately one month later, she was questioned by the police and shown about 40 photographs. Redmond testified she identified photographs of Collins, Nellum and Hooper as resembling men that were in the group. She further

testified that the man leading the group wore a wide-brim hat and that he could have been Collins.

"On cross-examination Redmond stated she had never seen Bracey before. She also stated that because she did not see the face of the man who was leading the group, she could not say for certain that she saw Collins on the night of the murders.

"Laverne Lyles testified that in November 1980 she lived in a fifth-floor apartment at 2240 South State. On the evening of November 12, she went grocery shopping with two friends, returning to the parking lot of her building around 10 p.m. Lyles testified she went to her apartment to get a shopping cart for her groceries. As she walked downstairs, she saw Collins on the second-floor landing wearing a 'Spanish type' hat and a long, maroon or burnt-orange leather coat. According to Lyles, Collins was on the apartment side of the stairway door and was closing the door as she approached. Lyles stated she went to her automobile and as she was unloading her groceries from the trunk, she observed three men come out of the building and walk toward the parking lot. One of the men, she said, had his hands tied and had a long handkerchief hanging from his mouth. Lyles further testified that she identified a photograph of Bracey as the man in the lead and a photograph of Pettigrew as the man with his hands bound. She could not identify the third man. She also identified a photograph of Collins wearing a wide-brim hat and said it was the same hat he was wearing when she saw him on the second-floor landing.

"Christina Nowell told the jury that she first met defendant Bracey in May of 1980 at the King Midas Lounge in Chicago. In late August, Bracey came to her home, and she showed him a .38–caliber Charter Arms revolver which she kept in the bedroom. Nowell stated she went to the basement for a short time, leaving Bracey in the room alone. The following day she discovered that her gun was missing. Nowell further testified that, in early September 1980, she was at the King Midas Lounge with Bracey; that a man and woman came to their table; that the woman gave Bracey a brown paper bag con-

taining a sawed-off shotgun; and that Bracey 'broke down' the gun and gave it to William Lane, an employee of the lounge, who put the weapon behind the bar.

"On November 25, 1980, she was again at the lounge with Bracey and asked him when he was going to return her revolver. Nowell testified an argument ensued during which Bracey threatened to have her 'wasted.' He then told her 'he had murdered some people with [her gun] and threw it in the Chicago River.'

"The evidence also showed that on December 30, 1980, police officers conducting a search of apartment 206 at 2240 South State found two pieces of rope in a bedroom closet. An expert from the Chicago Police Department Crime Laboratory testified that one of the pieces had the same characteristics as the rope found on Pettigrew's wrist and that they 'could' have come from the same length of rope. The expert admitted, however, that it was a very common type of rope, found in almost any hardware store.

"A firearms expert testified regarding the tests performed on the revolvers recovered from Lake Michigan. The tests revealed that the .38–caliber Charter Arms revolver would mark a bullet with eight lands and grooves to the right while the .357 Rigueur revolver would mark a bullet with five lands and grooves to the right. Bullet or bullet fragments bearing the characteristics of at least one of the weapons were found in each victim. However, because of their rusty condition, the expert could not say for certain that the guns fired the bullets taken from the victims. However, the Charter Arms revolver, by use of its serial number, was found to be the gun that had been stolen from Christina Nowell. The expert also testified that the expended shotgun shells found near Pettigrew's body were fired from the same shotgun but that no shotgun was admitted for testing.

"Both defendants raised alibi defenses. In addition, they introduced testimony which suggested that Nellum, Hooper and a man named Jesse were responsible for the crimes.

"Bracey's alibi consisted of the testimony of his sister, Barbara Harris. When she was asked to recount the events of November 12, the State objected and argued at a side bar that they had not been informed that Bracey would present an alibi. (Indeed, the record shows that four days earlier Bracey's attorney told the State there would no [sic] be alibi defense.) The court then called a recess to give the State an opportunity to question Harris. When she again took the stand she testified that, at approximately 6 p.m. on the day of the murders, Bracey came to her home and had dinner with her and her husband. According to Harris, her husband went to bed between 7 and 7:30, after which she and Bracey discussed a number of financial matters pertaining to his work as an artist. Bracey, she said, left her home after 11:30 p.m. Under cross-examination, Harris admitted she never told the police, State's Attorney, or anyone else in authority that Bracey was with her on the night of the murders.

"Bracey, testifying in his own behalf, said he had known Nellum, Hooper and Lacey for a number of years and that he had known a man named Jesse for six or seven years. Saying he was at his sister's house until 11:30 p.m. on November 12, he denied being in apartment 206 on the night of the murders. He also denied ever being in Christina Nowell's home or stealing her revolver. According to Bracey, Hooper had Nowell's revolver. As to the November 25 conversation with Nowell regarding her gun, he testified that because he was a friend of Hooper, Nowell approached him in the King Midas Lounge and asked him to tell Hooper to return it. He testified he told her that the matter was between her and Hooper and that he 'didn't have nothing to do with it.' He admitted that an argument ensued and that angry words were exchanged, but denied that he threatened to have her 'wasted.' Supported by the testimony of William Lane, Bracey also repudiated Nowell's assertion that he received a shotgun in the lounge in September of 1980 and gave it to Lane, who put the weapon behind the bar.

"In an apparent attempt to reduce the impact on the jury of his criminal record, Bracey admitted on direct examination that he had three prior convictions, one for rob-

bery and two for armed robbery. Cross-examination revealed that the last conviction resulted from an armed robbery which he committed while an escapee from Stateville Penitentiary. Also on cross-examination, Bracey admitted that he never told the police he was at his sister's when the murders were committed, and that he did not tell them that a man named Jesse was involved in the crimes. He also denied telling the police that he was in the area of apartment 206 on the night of the murders. In rebuttal the State called two police officers who testified that, when questioned, Bracey admitted to being in the area of the apartment on the night of the murders. Bracey then again took the stand and explained that he merely replied affirmatively to the officers' question of whether he had 'ever' been in the vicinity of the apartment.

"Collins, also testifying in his own behalf, said he had 10 previous armed-robbery convictions. He also said he knew Nellum, Hooper, Bracey, and Lacey, having met the latter two while in prison. He further testified that on November 12 his brown Cadillac was parked behind the King Midas Lounge, where it had been for several weeks because of mechanical problems, and that he did not get the car running again until November 15 or 16. As a result, on the night of the murders he was driving his 1968 Chevrolet, which he had previously loaned to Sandra Johnson but which was returned to him on November 11.

"Collins recounted that at approximately 3 p.m. on the day of the murders he took his girlfriend, Beatrice Mack, to a nearby clinic. They then went to the apartment of Irene Parker, Mack's mother. Later that evening Collins and Mack went grocery shopping at a nearby A & P, leaving that store between 9:30 and 10 p.m. On the way back to Parker's apartment, they stopped at 2240 South State. While Mack waited in the car, Collins went to apartment 206. According to Collins, only Nellum, Hooper, Derrick Phipps, and Ben Weathers were present. Following a brief conversation, Collins rejoined Mack, and the two returned to Parker's home. There two other individuals who were visiting Parker helped them carry the groceries upstairs, after which they all ate dinner to-

gether. Collins testified that he left the apartment with Mack at approximately 1 a.m. and that they checked into a motel where they remained until the following morning.

"Mack substantially corroborated the events as related by Collins. Her cross-examination revealed, however, that she had been a heroin addict for about five months prior to November 12 and that on the afternoon of the 12th, Collins took her to a clinic where she was undergoing methadone treatment. She also stated that she first dated Collins on November 9, three days before the murders, saying they went to a kung-fu movie at the United Artist Theater in Chicago. In rebuttal the State established that no kung-fu movie was playing at that theater the week of November 9.

"Irene Parker, Carolyn Washington and Randolph Harper all testified they had dinner with Collins and Mack on the night of the murders. Washington and Harper also said that at approximately 10:30 p.m. they helped Collins carry groceries from his blue Chevrolet.

"In an attempt to establish that his Cadillac was inoperable on the night of the murder and therefore could not have been driven by Nellum, Collins called Sandra Johnson and Earl Young to the stand. Johnson, who had known Collins for almost 10 years, told the jury she was driving Collins' blue Chevrolet in early November but that she returned the automobile to him on November 11, prior to leaving for a trip to Michigan. She stated she saw Collins' Cadillac on November 10 or 11 parked behind the King Midas Lounge and upon returning from Michigan on November 13, she again observed the Cadillac parked in the same location. Her credibility may have been weakened, however, by her admission that she had been convicted of three counts of robbery and also of misdemeanor theft. In addition, she stated on cross-examination that she was receiving public aid in Illinois, but denied that the purpose of her Michigan trip was to apply for public aid in that State. In rebuttal a Chicago police officer testified to a conversation with Johnson in which she in-

formed him that she went to Michigan to apply for public assistance.

"Young, the owner of the King Midas Lounge, testified he first noticed a brown Cadillac parked behind his establishment on November 2. Not knowing the owner, he left a note on the windshield four or five days later requesting that it be removed. Three or four days thereafter he saw a number of men, one of whom he identified as Collins, working on the automobile. According to Young, approximately one and a half to two weeks passed after he first observed the Cadillac until it was removed.

"Also testifying for the defendants were Derrick Phipps and Ben Weathers. Both claimed they were in apartment 206 with Nellum and Hooper on the evening of November 12. Bracey, they said, was not present. Around 9:30 p.m., three men, accompanied by a man identified only as Jesse, arrived and went into one of the bedrooms, followed by Nellum and Hooper. Approximately 30 minutes later, Collins arrived looking for Bracey. Upon being informed that Bracey was not present, Collins left the apartment. Shortly thereafter, Phipps and Weathers departed together, presumably leaving Nellum, Hooper, Jesse and the three men in the bedroom.

"The credibility of the witnesses was made vulnerable by the disclosure of their respective criminal records. Weathers admitted he received a 10- to 30-year sentence in 1975 for armed robbery. Phipps pleaded guilty in 1974 to an armed-robbery charge, and in 1976 he received concurrent sentences of 9 to 18 years for attempted murder and 6 to 18 years for armed robbery. (The record also shows—although it was not brought to the attention of the jury—that he was awaiting trial on two additional criminal charges when he testified.) Phipps' credibility may have been further weakened by his inability to give but the vaguest description of Jesse. Although he claimed he first met Jesse in the Stateville Penitentiary, Phipps could only say that he was about the same height and weight as the Assistant State's Attorney conducting the cross-examination. Also, after first being unable to recall what Jesse was wearing when he arrived at apartment 206, he then stated that he was wearing a wide-brim hat similar to one worn by Collins. Finally, Phipps was unable to describe any of the men who allegedly came to the apartment with Jesse, nor could he recall where the apartment was located in the building."

*Collins I*, 478 N.E.2d at 272–76.

## II. EXHAUSTION, WAIVER AND DEFAULT

Respondents do not contend that petitioners have failed to exhaust their state court remedies as to any claim. Collins does not contend that any issues are unexhausted. Bracy indicates it is possible the Illinois courts would consider some issues of fundamental error in a second postconviction proceeding. B Reply 8.[3] The settled Seventh Circuit law is that postconviction proceedings are not necessary for exhaustion unless there is "direct precedent indicating that under the particular circumstances of a prisoner's case the waiver doctrine will be relaxed." *Harris v. DeRobertis*, 932 F.2d 619, 621 (7th Cir. 1991) (quoting *United States ex rel. Williams v. Brantley*, 502 F.2d 1383, 1386 (7th Cir. 1974)). No party points to any such direct precedent supporting that any of petitioners' present claims can still be presented in postconviction proceedings. The claims presented will be treated as exhausted.

▆▆ Respondents contend that a number of the claims have been waived because procedurally defaulted in the Illinois courts. Ordinarily, this court may only consider habeas corpus claims of state prisoners if those claims have, without procedural default, first been fairly presented to the state's highest court. *See Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). Procedural default, however, will

---

**3.** Each subheading in Section III will make reference to the particular claims in the petitions: B for Bracy and C for Collins. Citations to claims will be by using the letter and number, *e.g.* B1, C1. Citations to paragraphs of each petition will include the paragraph symbol, *e.g.* B¶1, C¶1. Citations to pages of respondents' briefs will include R and the initial of the defendant to which that brief applies, *e.g.* RB 1, RC 1. Citations to petitioners' briefs will include reply, *e.g.* B Reply 1, C Reply 1.

not preclude consideration of the claim if cause for the default and actual prejudice is shown or if failure to consider the claims would be a fundamental miscarriage of justice. *Id.; Jenkins v. Gramley,* 8 F.3d 505, 508 (7th Cir.1993). Constitutionally ineffective assistance of counsel can constitute cause. *Coleman,* 501 U.S. at 752–55, 111 S.Ct. at 2566–67; *Buelow v. Dickey,* 847 F.2d 420, 426 (7th Cir.1988), *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1168, 103 L.Ed.2d 227 (1989). However, the ineffective assistance of counsel claim cannot be used as cause unless the ineffective assistance claim has first been presented as an independent claim in the state court. *Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (1986); *Morrison v. Duckworth,* 898 F.2d 1298, 1300 (7th Cir.1990). Petitioners make some general responses as to the waiver of some of their claims. These arguments will be considered here, while arguments specific to particular claims will be discussed as the individual claims are considered.

Petitioners assert that ineffective assistance of postconviction counsel can constitute cause excusing a procedural default. However, there being no constitutional right to counsel on postconviction review, the ineffective assistance of postconviction counsel cannot constitute cause. *Coleman,* 501 U.S. at 752–57, 111 S.Ct. at 2566–68; *Jenkins,* 8 F.3d at 508; *Williams v. Chrans,* 945 F.2d 926, 932–33 (7th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992).[4] This is true even if postconviction proceedings are the first opportunity that the claim may be raised. *Bonin v. Vasquez,* 999 F.2d 425, 429 (9th Cir.1993). However, if an issue was procedurally defaulted for postcon-

viction review because not preserved by trial counsel or counsel presenting the direct appeal, ineffective assistance of that trial counsel or appellate counsel can constitute cause. *See Freeman v. Lane,* 962 F.2d 1252, 1258–59 (7th Cir.1992).

Passing reference is also made to petitioners being denied the "legal tools" necessary to perfect their postconviction remedies so that the denial of constitutionally guaranteed access to the courts also constitutes cause. *See* B Reply 6 (citing *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). Bracy states the Supreme Court has not considered whether such a situation can constitute cause, but makes no argument in support of this contention and cites no lower court cases.[5] There are also no factual allegations as to what legal resources were unavailable or precluded where petitioners were incarcerated. No adequate argument or allegations having been made, this contention need not be considered.[6] *Cf. Thomas v. Lewis,* 945 F.2d 1119, 1123 (9th Cir.1991).

Citing *Beam v. Paskett,* 3 F.3d 1301, 1306–07 (9th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994), it is argued that the mandatory nature of the Illinois Supreme Court's review of death sentences means that no fundamental error can be considered to be waived. *See* B Reply 7– 8. *Beam* concerned a death sentence under Idaho law where the pertinent statutory provision provided that the Idaho Supreme Court had "an affirmative duty to review the entire record in a capital case to determine, *inter alia,* whether 'the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.'"

---

4. Petitioners contend that *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), implicitly overrules cases holding that there is no right to counsel on collateral review. Assuming *McCleskey* contains such an implicit holding, petitioners ignore that *Coleman,* 501 U.S. at 752–55, 111 S.Ct. at 2566–67 (citing *Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987); *Murray v. Giarratano,* 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989)), expressly reaffirms that there is no right to counsel on collateral review. *Coleman* was decided after *McCleskey,* as were *Jenkins* and *Williams v. Chrans.*

5. The Tenth Circuit has observed that such circumstances may constitute cause. *See Dulin v. Cook,* 957 F.2d 758, 760 (10th Cir.1992).

6. Lack of legal resources at a prison generally will not constitute unconstitutional interference with access to the courts where the prisoner also has the assistance of counsel. *See Casteel v. Pieschek,* 3 F.3d 1050, 1054 & n. 4 (7th Cir. 1993).

*Id.* at 1306 (quoting Idaho Code § 19–2827). Based on this statute and Idaho case law, the Ninth Circuit held that, regardless of whether it was raised in briefs or expressly discussed in the Idaho Supreme Court's opinion, the Idaho Supreme Court necessarily had decided whether the death sentence had been based on an arbitrary factor and therefore there could be no procedural default on such a claim. Recently, the Eighth Circuit distinguished *Beam.* It held that a Missouri statute that required review of "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," Mo.Rev.Stat. § 565.035.3(1), only required the Missouri Supreme Court to review whether any of the aggravating factors considered by the jury was an "arbitrary factor," and did not mandate review of all instructional and constitutional errors for arbitrariness. *Nave v. Delo,* 22 F.3d 802, 815–16 (8th Cir.1994).

Illinois law provides: "The conviction and sentence of death shall be subject to automatic review by the Supreme Court. Such review shall be in accordance with rules promulgated by the Supreme Court." 720 ILCS 5/9–1(i). This statute is mandated by the Illinois Constitution. Ill. Const. Art. 6, § 4(b) (1970) ("Appeals from judgments of Circuit Courts imposing a sentence of death shall be directly to the Supreme Court as a matter of right.") The Illinois Supreme Court has promulgated the following rules. "[A]ppeals by defendants from judgments of the circuit courts imposing sentence of death shall lie directly to the Supreme Court as a matter of right." Ill.Sup.Ct.R. 603. "In cases in which a death sentence is imposed, an appeal is automatically perfected without any action by the defendant or his counsel." *Id.* 606(a).

■ Unlike Idaho law, or even Missouri law, Illinois law does not mandate that specific issues be considered by the Illinois Supreme Court. The case law is consistent with the statutory provision. Under Illinois law, to preserve an issue for appeal from a criminal conviction, it generally must be raised at trial and also presented in a motion for new trial pursuant to 725 ILCS 5/116–1. *People v. Enoch,* 122 Ill.2d 176, 119 Ill.Dec.

265, 270–71, 522 N.E.2d 1124, 1129–30, *cert. denied,* 488 U.S. 917, 109 S.Ct. 274, 102 L.Ed.2d 263 (1988). This rule applies to capital cases. *Id.,* 522 N.E.2d at 1131. "[O]ur constitutional obligation to review death penalty cases does not require us to review every issue raised on appeal when the issues are not properly preserved by an objection in the trial court and a written post-trial motion.... [W]hen the defendant fails to comply with the statutory requirement to file a post-trial motion, our review will be limited to constitutional issues which have been properly raised at trial and which can be raised later in a post-conviction hearing petition, sufficiency of the evidence, and plain error." *Id.,* 522 N.E.2d at 1131–32. *See also People v. Banks,* 161 Ill.2d 119, 204 Ill.Dec. 107, 118, 641 N.E.2d 331, 342 (1994); *People v. Hudson,* 157 Ill.2d 401, 193 Ill.Dec. 128, 137, 626 N.E.2d 161, 170 (1993). Neither the statute nor Illinois case law mandates that the Illinois Supreme Court decide all possible issues that could be raised on direct review of a capital case. No issues can be assumed to have been decided by the Illinois Supreme Court that were not presented to or discussed by the court. Even those issues, such as plain error, which are not waived by failure to present them in the trial court, still must be fairly presented to the Illinois Supreme Court either on direct appeal or through postconviction proceedings or they will be waived for purposes of federal habeas corpus review.

■ If a state procedural bar of an issue is not applied with regularity and consistency, it will not preclude raising the issue in a federal habeas corpus petition. *Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988). *Johnson* applies prior Supreme Court precedent holding that a "state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed.'" *Id.* at 587, 108 S.Ct. at 1987 (quoting *Hathorn v. Lovorn,* 457 U.S. 255, 262–63, 102 S.Ct. 2421, 2426–27, 72 L.Ed.2d 824 (1982) (quoting *Barr v. City of Columbia,* 378 U.S. 146, 149, 84 S.Ct. 1734, 1736 (1964)). The Seventh Circuit has explained what is meant by "ade-

quate" and by "strictly or regularly followed."

A state ground is "adequate" only if the state court acts in a consistent and principled way. A basis of decision applied infrequently, unexpectedly, or freakishly may be inadequate, for the lack of notice and consistency may show the state is discriminating against the federal rights asserted.

\* \* \* \* \* \*

A requirement of consistency poses special problems for forfeiture rules, because every state uses exceptions such as "plain error" or "sufficient reason" or even "cause and prejudice" to deal with cases in which application of the ordinary rules would produce unacceptably harsh consequences.

\* \* \* \* \* \*

Statements such as the one in *Barr* that a state procedural ground will be respected only when "strictly or regularly followed," 378 U.S. at 149, 84 S.Ct. at 1739, turn out to be too strong, unless the "procedural ground" is understood to be a complex of rules and qualifications. Wisconsin employs a rule that failure to raise a ground forfeits it unless there are "sufficient" reasons. A rule of forfeiture-unless-good-reasons may be "strictly" followed when the state is scrupulous about treating particular reasons as "sufficient" routinely and others as insufficient with equal regularity.

Searching for "regularity" in the state's employment of excuses and exceptions would embroil the federal court deeply in questions of state law and procedure. An alternative to the comprehensive survey of state cases every time a state invokes waiver is to recharacterize what it means for a state to apply its rule strictly. Both the Supreme Court and the inferior courts respect state procedural grounds unless they are regularly *dis* regarded (or seemingly have been manufactured for the occasion as in *Johnson*). A state ground that is solidly established will be respected even though not "strictly" followed. Any other

approach would discourage state courts from applying plain error doctrines, lest giving one prisoner a break disables the state from enforcing its procedural rules with respect to many others.

*Prihoda v. McCaughtry,* 910 F.2d 1379, 1384 (7th Cir.1990).

 It is contended that the Illinois Supreme Court declined to apply plain error in Bracy's and Collins's case, while applying it in other cases. C22–23. It is argued that, in at least two other cases, the Illinois Supreme Court has found error in prosecutors' closing remarks even though those remarks were provoked by arguments of defense counsel. C Reply 58–59 (citing *People v. Monroe,* 66 Ill.2d 317, 5 Ill.Dec. 824, 362 N.E.2d 295 (1977); *People v. Stock,* 56 Ill.2d 461, 309 N.E.2d 19 (1974)). *See also* C Reply 62 (citing *People v. Brisbon,* 106 Ill.2d 342, 88 Ill.Dec. 87, 478 N.E.2d 402, *cert. denied,* 474 U.S. 908, 106 S.Ct. 276, 88 L.Ed.2d 241 (1985)). It is contended that the application of invited error in *Collins I,* 478 N.E.2d at 287–88, is inconsistent with *Monroe* and *Stock.* The issue of invited error and whether petitioners were prejudiced by these particular prosecutorial arguments [7] is more in the nature of a substantive ruling than a procedural bar. Errors of state law are not a basis for granting federal habeas corpus relief. *Williams v. Chrans,* 945 F.2d at 956. An allegedly incorrect application of state law does not become a basis for habeas corpus relief simply by recharacterizing it as an equal protection violation because some defendants have different law applied to them. *Bowser v. Boggs,* 20 F.3d 1060, 1065–66 (10th Cir.1994). Also, this case does not involve arbitrary application of the law that might support an equal protection claim. *See Del Vecchio v. Illinois Department of Corrections,* 31 F.3d 1363, 1386 (7th Cir.1994) (en banc). Collins's Claims XXII and XXIII are not cognizable as independent claims.

As to the invited error issue, it is unnecessary to consider whether it is a procedural bar and, if so, whether such a bar has been inconsistently applied. Respondents do not contend that the prosecutorial misconduct is-

---

7. The particular remarks of the prosecutor are discussed more fully in § IIIC, *infra.*

sue to which invited error was applied has been waived because of any procedural bar. Instead that issue is addressed on the merits and will be discussed below.

■ It is also contended that the Illinois Supreme Court has been inconsistent in applying the plain error rule to prosecutorial remarks for which there were no contemporaneous objections. *See* C Reply 59–64. Only one case is cited where prosecutorial remarks were held to be reversible error even though no contemporaneous objection had been made. *See People v. Holman*, 103 Ill.2d 133, 82 Ill.Dec. 585, 602–07, 469 N.E.2d 119, 136–41 (1984), *cert. denied*, 469 U.S. 1220, 105 S.Ct. 1204, 84 L.Ed.2d 347 (1985). The prosecutorial remarks involved in that case and the cases cited therein, *see id.*, 469 N.E.2d at 140–41, are different from those involved in the present case. The Illinois Supreme Court may find plain error as a result of certain prosecutorial remarks without finding it in different remarks without being legally inconsistent. Petitioners have not made a showing of freakish application that would satisfy the standard set forth in *Prihoda*. The Illinois Supreme Court did not rely on any procedural bar that was inadequate.

### III. GROUNDS ASSERTED FOR RELIEF

Each petitioner has raised a number of issues. Bracy has divided his petition into 17 separate claims and Collins has divided his petition into 23 claims plus an additional 14 that he seeks to raise in three supplemental petitions.[8] Most issues have been raised by both petitioners. Therefore, each petitioner's contentions will be considered together, with all applicable arguments being considered as to each petitioner. All issues raised will be considered. The claims are addressed in the order set forth in Collins's petition, the lower numbered case.

### A. Exclusion of African–Americans from Jury (B2, C1)

It is alleged that the venire of 60 potential jurors contained 5 or 6 African–Americans. C¶ 396. Over objection, one African–Ameri-

can, Harry Cooper, was excused for cause because of commitments to his Little League team. C¶ 397–98; B¶ 59. At the time, no other African–Americans were among those under consideration for the jury. C¶ 399. The State exercised its peremptory challenges as to two African–American venirepersons. C¶ 401–02. The allegations do not specify whether any African–Americans were members of the jury that was impaneled.

■ Since decided after direct review in this case had been completed, *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), is inapplicable to petitioners' claims. *Williams v. Chrans*, 945 F.2d at 942–46. Petitioners (through Collins, C Reply 13–14) contend they can show systematic exclusion of African–Americans that is prohibited by *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). On postconviction review, the Illinois Supreme Court denied this claim on the ground that Bracy and Collins "did not raise any claim of the case-by-case exclusion of blacks required by *Swain* nor have they submitted any affidavits or made any sort of showing of this practice." *Collins II*, 180 Ill.Dec. at 64, 606 N.E.2d at 1141.

■ Failure to fairly present a claim to the state court constitutes a procedural default barring the presentation of the claim on federal habeas corpus review. *See Verdin v. O'Leary*, 972 F.2d 1467, 1472–73 (7th Cir. 1992). This includes fairly presenting the operative facts. *Keeney v. Tamayo–Reyes*, — U.S. —, —, 112 S.Ct. 1715, 1719, 118 L.Ed.2d 318 (1992); *Verdin*, 972 F.2d at 1474. The *Swain* claim has been procedurally defaulted. However, such default will be excused if cause and prejudice can be shown. *See Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565. Petitioners (through Collins, C Reply 14–15) contend cause can be shown by the ineffective assistance of postconviction counsel. Ineffective assistance of postconviction counsel cannot constitute cause. *See Coleman*, 501 U.S. at 752–57, 111 S.Ct. at 2566–68; *Jenkins*, 8 F.3d at 508; *Williams v. Chrans*, 945 F.2d at 932–33; *Bonin*, 999 F.2d at 429. The *Swain* claim has been waived

8. Leave is granted to file the supplemental peti- tions.

for failure to adequately present it to the state courts. Collins Claim I will be denied.

The focus of Bracy's allegations (B¶ 59) is that it was erroneous to excuse Cooper for cause. It is conceded that this issue was not raised in the Illinois courts (B¶ 60), but it is contended that failure to do so was ineffective assistance of counsel. Neither Bracy nor Collins support this contention. Bracy makes no specific argument as to either the merits of this issue or the alleged ineffective assistance in failing to object at the time Cooper was excused. No grounds for excusing the procedural default is found. Bracy Claim II is held to be waived for failure to raise it in the state courts.

### B. Nellum's Testimony—Discovery and a Hearing (B5, B6, C2)

In early 1992, a private investigator hired by Bracy's attorney spent 25 hours interviewing Morris Nellum.[9] Some of the interview was recorded. In July 1992, Nellum gave a sworn statement before a court reporter to counsel for Bracy. In the interviews and in the statement, Nellum said that some of his testimony at Bracy's and Collins's trial was false.

Thereafter, in April 1993, counsel for Bracy partially deposed Nellum in the Arizona postconviction proceedings, but, after answering some questions, without adding to his earlier statements, Nellum declined to continue unless his testimony was taken before a judge. Thereafter, the Arizona court declined to continue the deposition. Petitioners seek further discovery and a hearing to introduce additional Nellum testimony.

Although not stated by Nellum, it is argued that the assistant State's Attorney knew his testimony was false when given,

and knowing use of the false testimony is alleged by both petitioners.

In the interviews, statement, and deposition, Nellum does not testify that Collins and Bracy were not involved in the murders. He instead testifies that certain specific statements by him were false. Contrary to his trial testimony, Nellum said that he was beaten by and threatened by the police when he was first arrested and gave an initial statement. *See* Nellum Stmt.[10] 10–11, 15, 17–18, 20. He also stated that he was on one side of a two-way mirror adjoining an interrogation room where he saw Bracy being beaten. *Id.* at 14, 18. He states that his testimony that he saw Hooper at the scene of the crime was false.[11] *Id.* at 12, 19–20. His testimony that he saw Bracy with a shotgun was also said to be false. *Id.* at 22–23. He confirmed his testimony that he saw Collins with guns and that he was in a car with Collins. *Id.* at 23. He also testified that the assistant State's Attorney helped him get a job with musicians. This was after the trial and not promised prior to the conclusion of the trial. *See id.* at 23–24. Earlier in 1992, he told the private investigator that he never heard any gunshots and that he did not see Collins and others lead the murder victims to the car. This recantation was not repeated in his sworn statement or partial deposition.

■ Respondents primarily argue that recantation issues have been waived because not presented to the Illinois courts. The 1992 statements of Nellum occurred after the opening brief had already been filed in the postconviction appeal. Postconviction counsel raised the issue of recantation by Nellum for the first time in a reply brief, but that section of the brief was stricken and the issue is not discussed by the Illinois Supreme Court. *See Collins II.* Petitioners do not

---

9. At the time, counsel was representing Bracy in collateral proceedings in a subsequent double murder case in Arizona in which Bracy was also sentenced to death. *See State v. Bracy,* 145 Ariz. 520, 703 P.2d 464 (1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). Nellum had also provided testimony in that case. This counsel now represents Bracy before this court, but in July 1992 another attorney was representing Bracy in the Illinois postconviction

proceeding, which was then being briefed on appeal.

10. Citations are to the July 1992 statement which is exhibit C to Collins's Reply and exhibit B to Bracy's habeas petition.

11. In the statement, this answer is referred to as being inconsistent with testimony at Hooper's trial and inconsistent with testimony at Bracy's and Collins's trial.

dispute that this issue has never been adequately presented to the Illinois Supreme Court and that an argument ·can be made that it is too late to do so now. They contend, however, that it was newly discovered evidence and therefore cause exists for not having previously presented it to the Illinois Supreme Court. There is no contention by respondents that the information could have been discovered sooner had due diligence been exercised. The discovery of new evidence may, under certain circumstances, constitute cause. *Cf. Murray,* 477 U.S. at 488, 106 S.Ct. at 2645; *Cornell v. Nix,* 976 F.2d 376, 380 (8th Cir.1992) (*en banc*), *cert. denied,* —— U.S. ——, 113 S.Ct. 1820, 123 L.Ed.2d 450 (1993). Here, however, the newly discovered evidence is in the nature of a partial recantation of peripheral facts which are independently supported by other testimony and exhibits.

▆▆▆▆ Ordinarily, state court remedies must first be exhausted. The time for filing a postconviction petition had already expired at the time the new evidence was discovered. *See* 725 ILCS 5/122–1. The delay, however, will be excused if it was not due to the defendants' culpable negligence. *Id.* Respondents, though, do not point to any direct precedent that the Illinois courts would excuse the delay. Therefore, it is presumed that no remedy was still available in state court at the time the new evidence was discovered. *Harris v. DeRobertis,* 932 F.2d at 621.

▆▆▆▆ The introduction of perjured testimony at a trial is not, by itself, a constitutional violation that will support the granting of habeas corpus relief. *Shore v. Warden, Stateville Prison,* 942 F.2d 1117, 1122 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1973, 118 L.Ed.2d 573 (1992). There is only a constitutional violation if the prosecution knowingly used perjured testimony. *Id.; Del Vecchio,* 31 F.3d at 1387. Nellum's various statements do not support such a conclusion. Even if this element were satisfied, the recantation must be "substantially different" from the trial testimony and central to the decision in the case. *See Shore,* 942 F.2d at 1124. Mere impeachment generally will be insufficient. *See id.* The question is wheth-

er the new testimony is substantially different and central to the decision in the case. The recantation about being beaten and testifying falsely in Arizona only go to credibility. The false statement about whether Nellum saw Hooper at the crime scene is also peripheral to Bracy's and Collins's guilt if Nellum still links Bracy and Collins to the scene. Recanting of the testimony that he saw Bracy and Collins lead the victims to the car and that he heard gunshots does not substantially affect the State's case. Two other independent witnesses put Collins and Bracy at the scene of the abduction. Another independent witness heard the shots and the ballistics evidence strongly supports the use of a shotgun and the weapons found as a result of Nellum's information. Moreover, Nellum still states he picked up Collins at the murder site and does not expressly recant that Bracy was there.

▆▆▆▆ Petitioners seek permission to conduct discovery and hold a hearing, calling Nellum to testify. An investigator spent 25 hours talking to him, a sworn statement was taken by a lawyer for Bracy and a deposition was partially taken without developing a substantial recantation. Under the circumstances, good cause does not exist for permitting further discovery. *See* Rules Governing § 2254 Cases Rule 6(a); *Matta–Ballesteros v. Henman,* 896 F.2d 255, 259 (7th Cir.) *cert. denied,* 498 U.S. 878, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990). Hearing additional testimony from Nellum fourteen years after the events is not warranted. Given all the facts and circumstances, additional recantation, which would have little, if any, credibility, could only be cumulative impeachment.

Collins's Claim II focuses on the use of Nellum's allegedly perjurious testimony that he was with Collins when Collins threw the murder weapon in Lake Michigan. It has not been shown that Nellum would now testify that this event did not occur or that the prosecutor knew his contrary testimony at trial was false. On postconviction review, the Illinois Supreme Court addressed the question of the gun in the lake testimony being knowing use of perjured testimony by the prosecutor. It held that "defendants have failed to provide any evidence in support of

their allegation that the prosecution knowingly used perjured testimony.... Even if we were to accept the defendants' position, they were aware of Nellum's inconsistent statements at the time of their direct appeal and they failed to raise a due process challenge at that time. Accordingly, the issue is *res judicata* for purposes of this review." *Collins II,* 180 Ill.Dec. at 665, 606 N.E.2d at 1143. Since Collins Claim II is held to lack merit, it is unnecessary to consider whether it was waived.

### C. Prosecutorial Misconduct
#### (B4, B14, C3)

Petitioners raise issues as to prosecutorial misconduct at three stages of the trial. It is contended that the prosecutors acted improperly by bringing out evidence that certain witnesses had been relocated for protection and by using certain evidence to impeach witnesses. Petitioners also complain about certain prosecution arguments that were used in the prosecution's closing statement and in the prosecution's argument at the death penalty phase.[12]

#### 1. Waiver

■ Respondents contend that certain prosecutorial misconduct claims are waived because not fairly presented to the Illinois Supreme Court. Respondents argue that the claims presented to the Illinois Supreme Court were only argued on state law grounds and therefore the constitutional variations contained in the present petitions were not fairly presented to the Illinois Supreme Court. Following the Second Circuit, the Seventh Circuit has adopted the following standard as to fair presentation.

> If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts

that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of any one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Verdin,* 972 F.2d at 1473–74 (quoting *Daye v. Attorney General of New York,* 696 F.2d 186, 194 (2d Cir.1982) (*en banc*), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984)).

Here, petitioners cited only state cases. However, they identified the claims as ones for prosecutorial misconduct and asserted that there were violations of due process or the right to a fair trial. In *Collins I,* the Illinois Supreme Court referred to the right to a fair trial in discussing the prosecutorial misconduct claims before it. Since prosecutorial misconduct claims are in the mainstream of constitutional litigation; references to due process and the right to a fair trial were sufficient to inform the Illinois Supreme Court that the claims were constitutionally based. *Garofolo v. Coomb,* 804 F.2d 201, 206 (2d Cir.1986); *Chisholm v. Henderson,* 736 F.Supp. 444, 446 (E.D.N.Y.1990), *aff'd by unpublished order,* 953 F.2d 635 (2d Cir.1991); *United States ex rel. Boone v. Sandahl,* 1992 WL 111089 *2 (N.D.Ill. May 8, 1992); *Saunders v. Riley,* 1991 WL 95352 *5 (S.D.N.Y. May 30, 1991). The claims presented to the Illinois Supreme Court[13] have not been waived for failure to fairly present them in constitutional terms.

#### 2. Standard

■ To be grounds for habeas relief, prosecutorial misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,*

---

12. Allegations of prosecutorial misconduct during the presentation of evidence are contained in Collins's petition. Most of the other prosecutorial misconduct claims are contained in both petitions. In any event, to the extent applicable, all arguments are considered as to both petitioners.

13. The question of waiver as to issues on which no arguments were presented to the Illinois Supreme Court will be considered separately.

416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). *Accord Romano v. Oklahoma*, —— U.S. ——, ——, 114 S.Ct. 2004, 2012, 129 L.Ed.2d 1 (1994); *Pierson v. O'Leary*, 959 F.2d 1385, 1387 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 168, 121 L.Ed.2d 115 (1992); *Williams v. Chrans*, 945 F.2d at 949. "It 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471 (quoting the court below). Viewed in the context of the entire case, any misconduct shown must be "so inflammatory and prejudicial to the defendant . . . as to deprive him of a fair trial," *Williams v. Chrans*, 945 F.2d at 949 (quoting *United States v. Chaimson*, 760 F.2d 798, 809 (7th Cir.1985)) (ellipsis in *Williams*), and must have "likely changed the outcome of the trial." *Pierson*, 959 F.2d at 1387. This includes consideration of whether the misconduct was "invited" by conduct of defense counsel,[14] whether objections were sustained, and any corrective or related instructions given. *See Darden*, 477 U.S. at 182, 106 S.Ct. at 2472.

### 3. During Presentation of Evidence

Petitioners complain that evidence as to Lyles and Nellum being relocated was elicited by the prosecution and also raised in the prosecution's closing argument. The Illinois Supreme Court held as follows on this issue.

... During cross-examination of Lyles the defense brought out the fact that Lyles had received money from the State's Attorney's office. On redirect examination by the State, Lyles testified that the money had been for security deposits and rent. There is nothing unfair about allowing the State to explain on redirect examination why it gave one of its witnesses money when that fact had been brought out by the defense during cross-examination. In closing argument, the defense referred to Lyles as being "well taken care of." On rebuttal the State asked, "why do you think we moved her? Do you think we were concerned about her [sic] responsibility to Laverne Lyles?" Again, there is

nothing unfair about allowing the State to explain in rebuttal argument why a defense witness was being "taken care of" by the State when that issue was raised by the defendant during closing argument. The complained-of testimony and arguments were invited by the defendants and thus did not deprive them of a fair trial. . . .

... Nellum testified during direct examination by the State that in return for his truthful testimony and plea of guilty on the concealment charges the State had agreed to recommend "three years protective custody and relocate my family." The defendants did not object to the testimony. An agreement reached between an accomplice witness and the State to secure the witness' testimony is relevant because it goes to the credibility of the witness and the weight to be given his testimony. . . . Nellum's testimony concerning his agreement with the State was relevant and did not deprive the defendants of a fair trial.

*Collins I*, 478 N.E.2d at 280.

■■■■ Evidence that a witness is in protective custody may be relevant, but should be used cautiously. *See United States v. Adamo*, 742 F.2d 927, 944–46 (6th Cir.1984), *cert. denied*, 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985). Here, petitioners questioned Lyles about benefits she had received from the government. It was unnecessary and improper for the prosecution to expand on that by also eliciting information about being in protection. However, the prosecution did not dwell on the fact that Lyles and Nellum were provided with protection. The few references made did not rise to the level of a constitutional violation by so inflaming the jury that petitioners were deprived of a fair trial. The references to protective custody are not a basis for granting habeas corpus relief. *Cf. United States v. Caliendo*, 910 F.2d 429, 436 (7th Cir.1990); *United States v. Panas*, 738 F.2d 278, 285 (8th Cir.1984); *United States v. Blankenship*, 707 F.2d 807, 810–11 (4th Cir.1983).

Certain impeachment of Beatrice Mack, an alibi witness for Collins, is also alleged to be

14. "[T]he idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole." *Darden*, 477 U.S. at 182, 106 S.Ct. at 2472.

prosecutorial misconduct. Cross examination of Mack as to the movie she saw on her first date with Collins and being a heroin addict then on methadone is characterized as collateral, and questioning her about a nose-ring that she did not wear while testifying is objected to as improper. The Illinois Supreme Court held that the trial court acted within its discretion in allowing in the allegedly collateral impeachment. *Collins I,* 478 N.E.2d at 281. As to the question about the nose-ring, to which an objection was sustained, the court stated: "We agree that the question was improper and showed a total lack of professionalism on the part of the assistant State's Attorney; however, we do not believe that it [was] so prejudicial as to deny the defendants a fair trial." *Id.* at 281–82.

■■■■■ Errors regarding the admissibility of evidence are generally a matter of state law that are an insufficient basis for granting habeas corpus relief. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Romano,* —— U.S. at ——, 114 S.Ct. at 2011; *Pierson,* 959 F.2d at 1389; *Gacy v. Welborn,* 994 F.2d 305, 316 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 269, 126 L.Ed.2d 220 (1993). To support the granting of habeas relief, the evidentiary ruling must implicate a specific constitutional right or the evidence's undue prejudice so greatly outweigh its probative value and likely affect the trial outcome that the defendant was denied a fundamentally fair trial. *Pierson,* 959 F.2d at 1389. A witness's recall of events that occurred the day before the event pertinent to the charges and a witness's addiction to narcotics can be relevant to that witness's credibility. It does not exceed the bounds of the Constitution for a state court to hold that such impeachment was not excludable as collateral. Also, the prosecution's particularized questioning as to Mack injecting the heroin into her arms with needles did not add such undue prejudice to the addiction questioning that a constitutional error was present.

**15.** The prosecutor asked: "By the way, Miss Witness, I saw you in the hall and you had an

■■■ As the Illinois Supreme Court correctly stated, the nose-ring question was improper and exhibited a lack of professionalism. However, there was only one question and it was immediately ordered to be stricken.[15] This question cannot be found to have caused significant prejudice and certainly does not support a constitutional claim.

■■■ Sandra Johnson provided testimony regarding whether Collins's Cadillac was being used by him on the night of the murders. She had testified that she returned Collins's Chevrolet on November 11, prior to her going to Michigan. She testified that she was receiving public aid in Illinois and Johnson was also questioned as to whether the trip to Michigan was for the purpose of applying for public aid there. She denied that was the purpose of her trip and, in rebuttal, a police officer testified that she had told him that was the purpose of her Michigan trip. No objection was raised at trial and the Illinois Supreme Court held that the issue was waived for purposes of appeal. *Collins I,* 478 N.E.2d at 282. Even if this issue has not been waived for federal habeas corpus purposes, it fails to state any ground for granting relief. This evidentiary question of collateral impeachment does not rise to the level of a constitutional violation. Any prejudice would be minimal. Johnson was also impeached on the basis of convictions for three counts of robbery and one of misdemeanor theft.

### 4. Closing Arguments

■■■ Collins complains that the prosecution made arguments as to Johnson that sought to link Collins to crimes committed by Bracy in Arizona. *See* C¶ 443. It is unclear how the prosecution argument linked Collins to the Arizona crimes. In any event, this issue was never raised in the state courts and no argument in support of it is made in response to respondent's motion to dismiss. *See* C Reply 23–30. This issue is waived.

■■■ It was part of petitioners' defense that the murders had been committed by

earring in your nose isn't that correct?"

Nellum, Hooper, and "Jesse." The prosecution twice argued in closing that no prosecution witness had been questioned about Jesse. That was factually incorrect; Nellum had been questioned about Jesse. Objections were made to the argument and the court overruled the objections, but instructed the jury to rely on its recollection of the evidence. The prosecutor had also told the jury that his statements were not evidence. The jury was correctly instructed as to the law and had the opportunity to consider the prosecution's argument in light of the evidence presented at trial. Also, whether Nellum had been *asked* about Jesse was not a key fact, especially since he had denied having any knowledge of Jesse. The prosecution's misstatement of the evidence was not so prejudicial as to constitute constitutional error. *Cf. Donnelly,* 416 U.S. at 644, 94 S.Ct. at 1872; *United States v. Green,* 25 F.3d 206, 210 (3d Cir.1994); *Therrien v. Vose,* 782 F.2d 1, 4 (1st Cir.), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 727 (1986); *Girardin v. Pyle,* 752 F.Supp. 979, 982–83 (D.Col.1990), *aff'd by unpublished order,* 936 F.2d 582 (10th Cir.), *cert. denied,* 502 U.S. 919, 112 S.Ct. 329, 116 L.Ed.2d 269 (1991). For similar reasons, the alleged mischaracterization of Lyles's testimony, *see* C¶ 469, is not constitutional error.

Petitioners also complain of arguments made by the prosecution in closing. The following arguments were made in the prosecution's initial summation, argued by assistant State's Attorney Owen. Hyman and O'Callaghan were both assistant State's Attorneys who testified at the trial.

OWEN: You heard the evidence. You heard the rebuttal witnesses that we put on after they put on their cock and bull defense, that Bracy was with his sister.

Do you think Lawrence Hyman came in and lied for me and Goggin? Do you think O'Callaghan lied for us? Do you think an attorney would put his license on the line for the likes of these two, Collins and Bracy? There is no way. We go to school for too long for that, to get up and perjure ourselves for those two guys, or against those two guys.[16]

\* \* \* \* \* \*

OWEN: The gun's in the lake; when Morris Nellum was on the witness stand he was cross-examined about the guns and he told you that he did in fact lie to the police. He said, "yes, I lied, I told the police I didn't know where the guns were." And you also heard that I interviewed Nellum a few hours later. Did you hear any questions about what Nellum told me about the guns? Did you hear anything about that at all? Did any lawyer for the defense ask that question? You see, I can't. That is improper for me, but they didn't because they didn't want to hear that.

McDONALD: Objection, judge.

COURT: Overruled.

McDONALD: That is improper argument.

Tr. 1285, 1288–89.

In his closing argument, Collins's attorney argued that testimony of assistant State's Attorney Dorfman (who did not prosecute the case) was inconsistent with Dorfman's written report. The defense attorney stated: "But they want Collins so bad, so bad that they made a guy come in here and tell you something that he knows is not in that report". Tr. 1333. Assistant State's Attorney Michael Goggin responded in the prosecution's rebuttal.

16. Although argued as error on direct appeal, no contemporaneous objection to this statement was made and the Illinois Supreme Court held that the claim based directly on this part of the summation was waived. *See Collins I,* 180 Ill.Dec. at 66, 67, 478 N.E.2d at 283. No response to the state's waiver argument was made by counsel on direct appeal, *see* Direct Appeal Reply 21–23, nor was any argument against waiver made on reconsideration, *see* Petition for Rehearing 18. On the postconviction appeal, no specific argument of ineffective assistance of trial or appellate

counsel was made as to this issue. *See* Appellants' Postconviction Brief 18–19, 22–26. *See also Collins II,* 606 N.E.2d at 1143, 1144. Not having previously been presented to the state court, ineffective assistance of counsel cannot constitute cause. While this part of the prosecution's summation cannot directly be considered as a claim, it is part of the context of the other statements that must be considered in determining whether the other statements constitute grounds for granting relief. In the direct appeal, defendants argued that any question of Goggins's invited error must be considered in light of

GOGGIN: It is Mr. Owen and my duty to present the prosecution of this case. That is what we are paid to do. That is what we swore on oath to do when we were sworn in as assistant state's attorneys. It is the responsibility of Mr. Frazin to represent this killer and it is the responsibility of Mr. McDonald to represent this killer.

McDONALD: Objection.

COURT: Overruled.

GOGGIN: And for Mr. Frazin to stand before you just now and to accuse me of suborning perjury by bringing in Mr. Dorfman is disgusting. And if you think that I would jeopardize my license, my family, my children, my future, to put Mr. Dorfman on in a case and make him lie, well I say to you ladies and gentleman, we had better leave this system, and we had better all start taking on other responsibility. That is what—

McDONALD: Objection, this is improper argument.

COURT: Overruled.

Tr. 1335–36.

■ The following arguments were also made by assistant State's Attorney Goggin in his rebuttal.

GOGGIN: You think about the fact that these two lawyers get up here and mimic and mock and demean you.

\* \* \* \* \* \*

GOGGIN: Let's talk about something, how Mr. McDonald misrepresents to you what the law is. You will hear about reasonable doubt. You will hear about beyond a reasonable doubt, and you will be told that is what the burden of proof is. And let me tell you something. That is the same burden of proof in every case that is tried in this courtroom, every case that is tried in this county, and every case that is tried in this country. It is beyond a reasonable doubt. The penitentiary is full of people like Collins and Bracy who have been

proved guilty beyond a reasonable doubt, the Benny Weathers, the Derrick Phipps, the Roger Collins, the Murray Hoopers, and the Bill Bracys are convicted daily beyond a reasonable doubt. There is no mistake about that. Nothing at all.[17]

Tr. 1338, 1343.

Petitioners also point to additional statements made by the prosecution in its closing argument, but which were not raised as errors in the direct appeal to the Illinois Supreme Court. Therefore, by themselves, they cannot be grounds for granting relief. However, since prosecutorial misconduct must be evaluated in the context of the entire record, the additional statements are still relevant for evaluating the claimed errors that have not been waived.

OWEN: I mean, Morris Nellum got on the witness stand and said he was not the murderer, he told you that, and I'm the one, along with Eagen and Hyman who made the decision in this case, and we will live with this decision, and the decision was to use him as a witness against the killers, Cochise, Bracey, and Hooper, who by the way will be tried by Goggin and myself.

\* \* \* \* \* \*

OWEN: We have got the guns because we went out of our way, we went out of our way in this case because these two guys have to be taken off the street. We went out of our way and hired a professional diving service, and lo and behold they found the guns. Thank God they did.

\* \* \* \* \* \*

GOGGIN: ... They asked you to think about the fact that Morris Nellum lied about where the guns were. And let me tell you something, ladies and gentlemen, they didn't ask about any other questions and answers in these 13 pages? They didn't do that, did they, ladies and gentlemen? Why didn't they do that? What do you think is contained in these 13 pages?

Owen's statement in the initial summation. *See* Direct Appeal Reply 23.

**17.** Petitioners also contend that this statement constitutes grounds for relief because it misstates the government's burden of proof. States have leeway in defining what is meant by reasonable

doubt. Even ignoring that this argument was not the definition of reasonable doubt contained in the jury instructions, this description of the reasonable doubt standard does not approach constitutional error. *See Victor v. Nebraska,* —— U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).

What names do you think are mentioned in these 13 pages, and this was taken three to four hours before Owen got to Area One, before Owen accepted his responsibility on that weekend and came to Area One and talked to Hooper and talked to Nellum and decided to offer Nellum a deal. . . .

\* \* \* \* \* \*

GOGGIN: Let's talk about apartment 206. Last Wednesday when you were in the back this man (indicating), this professional killer took the stand and when he took the stand he did not know that I had this photograph (indicating)—

FRAZIN: Objection.

GOGGIN: People's exhibit No. 27.

FRAZIN: Objection.

COURT: Overruled.

GOGGIN: He did not know that our evidence technician when they recovered these ropes took photographs of that apartment and he took this witness stand and he testified in this case, and he testified—

McDONALD: I vigorously object to him talking about testimony taken outside the presence of the jury.

COURT: Well, that will be sustained.

\* \* \* \* \* \*

GOGGIN: What motive does Morris Nellum have? What reason does he have? What in his background is there that would make him come in and testify that Collins is a killer and that Bracy is a killer? What was there in his background that would make him lie about that, if he is lying? What did Collins do to him What did Bracy do to him? What did Hooper do to him? Nothing. There is no reason for him to lie. What reason is there for O'Callaghan and Hoke and the whole bunch of people at Area One to stop investigating the case and let the real killers go? What reason is there for Owen and me to sit here and let the real killers stalk the streets. What reason? There is none.

Tr. 1290, 1300, 1337, 1340–41, 1353.

■ Reference to facts not in the record is improper. *United States ex rel. Shaw v. De Robertis,* 755 F.2d 1279, 1281 (7th Cir.

1985); *Floyd v. Meachum,* 907 F.2d 347, 355–56 (2d Cir.1990). Here, in the initial summation, Owen made reference to his interview of Nellum, possibly implying that Nellum told him additional consistent information, thereby seeking to bolster the credibility of Nellum's testimony. However, whatever Nellum may have told Owen was not part of the evidence in the case. A defense objection to some of the argument by Owen was sustained.

■ The prosecutor grouped together himself, the other prosecutor, and the two testifying assistants, implying they were a team of honest persons and thereby personally vouching for the credibility of the testifying assistants. On rebuttal, Goggin referred to his oath as an assistant State's Attorney and argued, "And if you think I would jeopardize my license, my family, my children, my future, to put Mr. Dorfman on in a case and make him lie, . . . ." Defense objections were overruled. Just as relying on evidence outside the record can violate the Constitution, *see Shaw, supra,* vouching for the credibility of evidence involves some of the same problems in that the prosecutor's statements are not subject to cross-examination. *See United States v. Robinson,* 8 F.3d 398, 415 (7th Cir.1993); *United States v. Phillips,* 527 F.2d 1021, 1024 (7th Cir.1975). *Phillips* is a direct review case which indicates that the prohibition on arguing personal belief is "elemental and fundamental." *Id.* (quoting *Greenberg v. United States,* 280 F.2d 472, 475 (1st Cir.1960)). Other courts have recognized that a prosecutor's personal vouching for the credibility of evidence is a claim cognizable on federal habeas corpus review. *See, e.g., Floyd,* 907 F.2d at 354. However, the remarks being improper is not sufficient; relief will not be granted unless so inflammatory and prejudicial that the trial is unfair and unless the statements likely changed the outcome of the trial. *See § III(C)(2) supra.*

■ The Illinois Supreme Court held that the rebuttal argument about jeopardizing Goggin's license, etc. was invited error. *See Collins I,* 478 N.E.2d at 284. The Illinois Supreme Court ignored that arguments about challenges to the prosecutors' integrity

and a personalized response thereto were first raised by the prosecution in its initial summation. However, no objection was made to this statement. Defense counsel then went further and implied the prosecuting attorneys had knowingly solicited perjured testimony from their colleagues. Goggin's comments in rebuttal were a direct response to the accusation made against him. Goggin's comments were unnecessary and improper, but were not so inflammatory and prejudicial as to deny petitioners a fair trial. The jury was not prevented from fairly considering the credibility of the witnesses.

The comment Owen made about the gun and his interview with Nellum was characterized by the Illinois Supreme Court as "one that would have been better left unsaid." *Collins I*, 478 N.E.2d at 284. The Illinois Supreme Court held that there was "but a fleeting reference to this subject" and held that the comment could not be held to be reversible error viewed in light of the other evidence. *Id.* This court agrees.

█ In his rebuttal, Goggin refers to the 13-page statement of Nellum that was not before the jury and implies that this statement bolsters Nellum's credibility. At another point, Goggin argues about testimony at a voir dire outside the jury's presence, but the court upheld an objection to this argument. The prosecution made a number of statements putting forth the theory that it was the defense attorneys' duty to defend guilty killers and, consistent with their duty, they sought to lie to the jury and mock and demean the jury. The prosecution also made a number of statements that they would not be prosecuting the case or presenting certain evidence if they did not personally believe the defendants had committed the crime and Nellum was telling the truth.

None of these statements individually or taken together are so egregious or inflammatory as to constitute a due process violation. The jury was instructed that the attorneys' arguments were not evidence. The statements were not so extreme that it is likely the jury ignored this instruction. Moreover, the evidence in this case was so strong that it is not likely that the improper argument affected the outcome of the trial. The prose-

cution offered Nellum's eyewitness testimony. Although his credibility was questioned, there was substantial corroborating testimony. Other witnesses saw Collins at or near the apartment where the victims had been held. Nowell's testimony linked Bracy to one of the murder weapons. Further, the alibi evidence of both petitioners was weak due to the doubtful credibility of the alibi witnesses.

This is not a case like *Shaw*, 755 F.2d at 1281–85, where the prosecutor indicated that evidence not before the jury would show the defendant was guilty and jury questions indicated jury uncertainty about the defendants' guilt. This case is more like cases in which questioned remarks were held to be an insufficient basis for granting habeas corpus relief. *Cf., e.g., Gonzalez v. Sullivan,* 934 F.2d 419, 423–24 (2d Cir.1991); *Kennedy v. Dugger,* 933 F.2d 905, 914 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1518, 117 L.Ed.2d 654 (1992); *Bradley v. Meachum,* 918 F.2d 338, 343–44 (2d Cir.1990), *cert. denied,* 501 U.S. 1221, 111 S.Ct. 2835, 115 L.Ed.2d 1004 (1991); *Lundy v. Campbell,* 888 F.2d 467, 479–80 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990); *Shepard v. Lane,* 818 F.2d 615, 622 (7th Cir.), *cert. denied,* 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987). Petitioners are not entitled to relief based on the closing arguments of the prosecutors.

### 5. Sentencing Phase Arguments

█ Petitioners also complain of prosecutorial misconduct during closing arguments of the sentencing phase. The same standard is applicable to both the guilt phase and the sentencing phase; the misconduct must so infect the sentencing proceeding with unfairness as to violate due process. *See Romano,* —— U.S. at ——, 114 S.Ct. at 2012.

█ During his closing statement, which was short, Bracy's attorney made an emotional argument in which he stated his opposition to the death penalty and made reference to the commandment "thou shalt not kill" as being a reason not to impose the death penalty. In rebuttal, assistant State's Attorney Owen began as follows:

OWEN: Are you going to follow your oaths? Are you going to do what you raised your right hands and swore to do? Are you going to follow the law as it is going to be given to you by the judge—

McDONALD: This is improper—

OWEN: —and as you said you—

COURT: Overruled.

OWEN: Each and every one of you before you were accepted by both sides in this case was asked by the judge, "Could you in certain circumstances consider the imposition of the death penalty?" Every one of you twelve citizens said that you could and that you would.

You took an oath following that to follow the laws of the State of Illinois.

I'm not going to get up here and give you a sermon. I'm not going to preach. But I am going to comment on one thing that Mr. McDonald said. He said, "Thou shalt not kill."

I've heard that before. People in 1941 through 1945 killed in the name of their country—

McDONALD: Judge, I'm objecting to this argument—

COURT: Overruled.

OWEN: —in service to their country. Some of us went to Viet Nam and had to kill for this country, and I will be damned if anybody is going to tell me that what we did in Viet Nam or in any other war was a violation of the Fifth Commandment of the Bible.

McDONALD: Objection. This is entirely wrong—

COURT: Overruled.

OWEN: It is no more killing than what you ladies and gentlemen of the jury swore that you would do after we presented all of the evidence in this case.

To stand up here and tell you that if you in fact find that there are no mitigating factors, no mitigating circumstances sufficient enough to preclude the imposition of the death penalty, is a slap in every veteran's face.

McDONALD: Objection.

COURT: Overruled. He may argue, just as you argued.

Tr. 1644–46.

The Illinois Supreme Court held that the prosecution's argument was invited by defense counsel's argument. *Collins I*, 478 N.E.2d at 288. As was indicated by the Illinois Supreme Court, the prosecution's argument was a "bit dramatic." *See id.* However, the argument of Bracy's counsel was also a bit dramatic. Arguments about a jury's duty to follow law and presenting an analogy with fighting war were a response to defense counsel's reference to the Ten Commandments. Contrary to Bracy's argument, B Reply 32, the prosecution did not argue the jury should consider factors unrelated to mitigation or aggravation; it argued that the jury should follow the law which permits the imposition of the death penalty.[18] The argument as to war did not so infect the sentencing proceeding with unfairness as to violate due process.

The remaining claims based on sentencing phase arguments, C¶¶ 477–78, 480–84, are waived either because not objected to at trial, *see Collins I*, 180 Ill.Dec. at 66, 67, 478 N.E.2d at 283, or not raised on appeal and no claim of ineffective assistance of trial or appellate counsel has been adequately presented to the Illinois Supreme Court. *See* Appellants' Postconviction Brief 18–19, 22–26; *Collins II*, 606 N.E.2d at 1143, 1144. Having failed to adequately present claims of ineffective assistance of counsel to the state court, ineffective assistance of counsel cannot constitute cause for failing to present issues to the state court. *See Murray*, 477 U.S. at 488–89, 106 S.Ct. at 2645–46; *Morrison*, 898 F.2d at 1300.

For the foregoing reasons, none of the prosecutorial misconduct allegations state a basis for granting relief. Bracy Claims IV and XIV and Collins Claim III will be denied.

---

**18.** Even if it were true, as petitioners contend, that the argument invoked a factor irrelevant to aggravation or mitigation, a recent Supreme Court case indicates that presentation of evidence irrelevant to the sentencing determination is not, standing alone, a basis for finding constitutional error; the evidence still must violate some constitutional prohibition. *See Romano*, —— U.S. at ——, 114 S.Ct. at 2011.

## D. Sufficiency of Evidence (B13, C4, C20)

■ It is contended that the evidence was insufficient to find petitioners guilty of murder.[19] and armed robbery. The convictions must be upheld if, viewing the evidence "in the light most favorable to the prosecution '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Kines v. Godinez*, 7 F.3d 674, 677 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1314, 127 L.Ed.2d 664 (1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). The entire transcript of the trial has been considered.[20] The Illinois Supreme Court's summary of the evidence that is quoted in § I *supra* is accurate and binding on this court.

### 1. Murder

■ Petitioners argue that Nellum's testimony was essential to the State's case. They do not dispute that his testimony alone could be sufficient to uphold the conviction. "The testimony of one eyewitness, even if he is a member of the criminal class and has no intrinsic credibility, is enough to convict in the absence of contrary evidence, or of [grave] contradictions." *United States v. Velasquez*, 772 F.2d 1348, 1352 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986). Nellum did not testify that he saw the actual shootings, but he was with the petitioners when they took the victims to where their bodies were found and participated in the disposition of murder weapons. Petitioners argue that all of Nellum's testimony could have been suggested by the police. That credibility question, however, was for the jury. The alleged deficiencies and contradictions in Nellum's testimony were not so great as to make his testimony unbelievable to any rational trier of fact. His testimony was highly corroborated by weapons and physical evidence. Independent witnesses placed both Collins and Bracy in the presence of the victims. Also, an independent witness heard the shots fired. While this testimony was also subject to impeachment, it was again a question of credibility for the jury. Petitioners' alibi testimony was not convincing. The jury's finding of guilt is amply supported by the evidence.

### 2. Armed Robbery

■ Petitioners also claim that the evidence was insufficient to support the armed robbery conviction. Assuming the merits of that claim, it is also claimed that the death sentence on the murder charges must be vacated because the armed robbery convictions were considered as aggravating factors.[21]

■ The jury was instructed that the following elements of armed robbery had to be proven: "One, that the defendants, or one for whose conduct each is responsible, took money from the person or presence of Frederick Lacey, R.C. Pettigrew, or Richard Holliman; and two, that the defendants, or one for whose conduct each is responsible did so by the use of force or by threatening the imminent use of force; and three, that the defendants, or one for whose conduct each is responsible, was armed with a dangerous weapon." Tr. 1372 (People's Instruction 21, I.P.I.Crim. 14.02).

The following testimony of Nellum is relied upon as being the evidence supporting that

19. The insufficiency of evidence of murder claim is not expressly raised by Bracy. Collins's argument, however, is being considered as to both petitioners.

20. Information outside the record is not to be considered in determining the sufficiency of evidence. It will only be considered as the basis of some other independent claim, *e.g.*, the recantation claim, *see* § III(B) *supra*, or the *Brady* claim, *see* § III(P) *infra*.

21. Felony murder was one of four options for supporting the second element of the murder

instruction. *See* Tr. 1366 (People's Instruction 16, I.P.I.Crim. 7.02). Since the aggravated kidnapping conviction also supported felony murder, vacating the armed robbery conviction clearly would not require vacating the murder conviction. Even if aggravated kidnapping were not an alternative, evidence of one or more of the three other alternatives for satisfying the second element would make vacating the armed robbery conviction harmless error as to proof of the second element of murder.

money was taken from one of the murder victims.[22] *See* CR 58–59.

On direct examination, Nellum testified as follows:

Q. Where was Bracy?

A. He was standing by the car too.

Q. Did you have any conversation with Bracy or did Bracy have a conversation with you at that time?

A. Well, he gave me a hundred twenty-five dollars.

Q. Who gave you a hundred twenty-five dollars?

A. Bracy.

Q. What did he say, if anything, when he gave you a hundred twenty-five dollars?

A. He just said "Here's a little something for you." And "Just be cool."

Tr. 514.

On cross-examination by Collins's attorney, Nellum testified as follows:

Q. Now, this deal that was going on in apartment 206 in the evening of November 12th, was it a robbery or something taking place?

A. I imagine so.

Q. Well, did you hear a conversation concerning a robbery, Mr. Witness?

A. No. It was all set up when I got there.

Q. You mean the deal to take these guys down, so to speak was already set up, right?

A. Yes.

Q. You knew you were going along with it, right?

A. Yes.

Q. For a piece of the action, right?

A. Yes.

Q. You were going along with the armed robbery, right?

A. I didn't know what they were doing.

Q. Well, you saw them being tied up, right?

A. I saw they were tied up after I got there.

Q. Did you figure they were going out for a view of the lake?

A. No, I didn't.

Q. So, you were willing at the time to take part in what looked like a robbery and could have been something more serious, is that right?

A. Yes.

＊ ＊ ＊ ＊ ＊ ＊

Q. Now, you telling us, Mr. Witness, that by the time you took Roger Collins's car and you got to the scene, why it was all over pretty much, wasn't it?

A. Yes.

＊ ＊ ＊ ＊ ＊ ＊

Q. But you just waited for Roger Collins to get back in the car and then, you drove back, right?

A. Yes.

Q. Not really having anything to do with anything?

A. Right.

Q. But you got a piece of the money?

A. Yes.

Q. Didn't give that back, did you?

A. Pardon me?

Q. You didn't give that back?

A. No, sir.

[Q. How much money did they take from those guys?

A. A hundred twenty-five dollars.

Q. How much money did you hear was taken total, Mr. Witness?

A. I didn't.

Q. Did you ever hear the figure eighteen hundred dollars?

A. Yes, I heard that.]

Q. Well, did you ask Collins, "How come I'm not getting more than this hundred twenty-five dollars?"

A. No I didn't.

Q. You figure that was enough just for your little part, not really having anything to do with it, right?

**22.** The bracketed portion of the testimony is hearsay that was challenged on direct appeal.

A. You could say that.

Tr. 538–39, 542, 543–44.

On cross-examination by Bracy's attorney, Nellum testified as follows:

Q. Now, you told us, meaning the Court and jury that you were given a hundred twenty-five dollars by Bracy?

A. Yes.

Q. Where were you given this money?

A. In the parking lot.

Q. Before you took the guns and dumped them in the lake, is that right?

A. Right.

[Q. You recall being asked this question by the police.

"Q. Now there was an amount of money taken after these guys were all shot. Do you know how much money was taken?

A. They told me eighteen hundred."

Was that asked of you and did you answer?

A. It was asked.

Q. Did you make that answer?

A. Yes.

 \* \* \* \* \* \*

Q. "Now there was an amount of money taken after these guys were all shot. Do you know how much money about was taken?"

That's exactly what's done here. Do you remember that question?

A. Right. Well, I, you know, like I said, I mean I told them what it was, what I thought.

Q. Well, did you see somebody going through the dead bodies for money, is that what you're telling us?

A. No.

Q. Did you see anyone take money from these people at any time?

A. No. I was told by Hooper how much money was taken.

Q. That's your old friend Hooper. When did he tell you that?

A. Well, it was later, after, you know, I had dropped him off at home, all this. He's always around. He and I talk a lot.

Q. I understand. So, you and Hooper, you drove Hooper home after you returned from the lake after you disposed of these guns, isn't that right?

A. This happened much later.

Q. How much later?

A. I didn't find out how much money was involved until much later. Something like months.

Q. Oh, months?

A. Yeah.]

Tr. 554–56.

The Illinois Supreme Court recognized that the testimony that Hooper told Nellum about the $1,800 was necessary to prove the armed robbery charge and also recognized that this testimony was hearsay. *See Collins I*, 478 N.E.2d at 277–78. The court held that the hearsay evidence was elicited by defendants and no objection was made to it and therefore it could be considered by the jury and supported the armed robbery conviction. Petitioners present no argument that it is a constitutional violation to consider hearsay evidence. This court is bound by the Illinois Supreme Court's evidentiary ruling. Whether the amount was $125 or $1,800 or more is not the issue. The defendants were involved in an armed robbery with the assistance of Nellum who received $125 from the proceeds of the robbery after the murders. There is sufficient evidence to support that money was taken from the victims.

For the foregoing reasons, Bracy Claim XIII and Collins Claims IV and XX will be denied.

### E. Illegal Search (C5)

Collins moved to suppress the introduction of certain photographs. He contended that the photographs were taken from his apartment without a search warrant. A police officer testified that he found the photographs in garbage on Collins's back porch. The trial judge credited the police officer's testimony and denied the motion to suppress. That ruling was affirmed on direct appeal. *Collins I*, 478 N.E.2d at 278–79. Fourth Amendment claims are not cognizable on a federal habeas corpus petition if, as here, the state has provided a full and fair opportunity

to litigate the issue. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

■ Collins argues that Judge Maloney was a corrupt judge who took bribes from defendants, but who automatically ruled· in favor of the state if no bribe was· being paid by the defendant. In accordance with this argument, Collins contends that he did not have a full and fair opportunity to litigate his motion to suppress. Proof of a biased tribunal would be a basis for this court considering Collins's Fourth Amendment claim. *See United States ex rel. Conroy v. Bombard*, 426 F.Supp. 97, 109 (S.D.N.Y.1976) (citing Bator, *Finality in Criminal Law & Federal Habeas Corpus Review for State Prisoners* 76 Harv. L.Rev. 441, 456 n. 26 (1963)). The Judge Maloney corruption claim is considered in § III(L) *infra*, where it is held to lack merit. Therefore, there is also no basis for considering the Fourth Amendment claim. Collins Claim V will be denied.

### F. A Judge's Wife on Jury—Discovery and a Hearing (B3, B17, C6–8)

One of the jurors in this case was Dorothy Downing ("Downing"), the wife of former Cook County Circuit Court judge and Illinois Appellate Court justice, Robert Downing ("Judge Downing"). In 1970, Judge Downing sentenced Bracy to 12 to 36 years in prison for an armed robbery conviction committed after the escape from the penitentiary and before he was apprehended. During voir dire, Downing stated that her husband being a judge would not cause her to favor one side or the other and that she could be impartial.

No party objected to Downing serving on the jury. During the trial, anticipating impeachment of Bracy, Bracy's counsel brought out Bracy's three prior armed robbery convictions in 1965, 1970, and 1975 on Bracy's direct examination. In questioning Bracy about the pertinent armed robbery conviction, Bracy's counsel mentioned Judge Downing's name together with the names of two other sentencing judges and the length of the terms imposed, 8–20, 12–36, and 6 years. Mrs. Downing and the other jurors heard that Judge Downing sentenced Bracy in the 1970 case. At the time this evidence was presented, neither defendant objected. Bracy was paroled in 1979.

Collins complains that revealing that Judge Downing sentenced Bracy, was prejudicial to him as well. Collins revealed, on direct examination by his attorney, that he was convicted of six armed robberies in 1966 and given 4–10 and 10 year sentences and convicted of four armed robberies in 1974 when he received a 10 year and a 10 year and a day sentence. Collins was released on parole in May 1980.

Since no objections to Downing's selection for the jury were raised, the Illinois Supreme Court held that objections to her selection were waived. *Collins I*, 478 N.E.2d at 282. *See also Collins II*, 180 Ill.Dec. at 63, 606 N.E.2d at 1140. However, on direct appeal, the Illinois Supreme Court also considered whether it was ineffective assistance of counsel to permit Downing to serve on the jury and to present evidence that her husband had previously sentenced Bracy. The Illinois Supreme Court held that the record did not show that permitting Downing on the jury was unreasonable and therefore failure to object to her selection could not constitute ineffective assistance of counsel. *Collins I*, 478 N.E.2d at 283. It also held that bringing out Judge Downing's name was an error of judgment on the part of defense counsel, but that it did not support an ineffective assistance of counsel claim because there was not a reasonable probability that the error affected the outcome of the trial. *Id. See also Collins II*, 180 Ill.Dec. at 64, 606 N.E.2d at 1141.

In his brief, Bracy does not contend that it was error to initially allow Downing to sit on the jury. However, he contends that, once it was revealed Judge Downing had previously sentenced Bracy, it was error to permit the trial to continue with Downing on the jury. *See* B Reply 9–11. Respondents contend this issue is waived, but Bracy argues that the Illinois Supreme Court never made a clear statement that it was waived. *See id.* Alternatively, Bracy argues trial counsel provided ineffective assistance of counsel. *Id.* at 14–16. Apparently adopting Bracy's argument as to the merits, the focus of Collins's argu-

ment is on waiver and the question of whether the state provided adequate opportunity to prove that petitioners were prejudiced by Downing sitting on the jury. Collins argues that postconviction counsel should have been provided funds to hire an investigator and the opportunity to investigate whether having Downing on the jury and bringing out the Judge Downing sentencing had an effect on the outcome of the trial. *See* C Reply 39–40.

On direct appeal, petitioners made the argument that Bracy primarily advances. *See* Direct Appeal Appellants' Brief 66–68. They argued that the constitutional right to a fair trial, including the right to an impartial tribunal, was violated by permitting Downing to sit on the jury after evidence came out that Judge Downing had previously sentenced Bracy. It was also argued that the attorneys provided ineffective assistance of counsel. *Id.* at 68. The state argued that no objection was raised during the trial and that petitioners motion for a new trial did not allege any prejudice as a result of Downing's service. *See* Direct Appeal Appellee's Brief 74.

The Illinois Supreme Court held as follows on this issue:

Defendants next argue they were denied a fair trial because one of the jurors was the wife of a judge who previously sentenced Bracey to prison. During *voir dire* it was learned that Dorothy Downing was the wife of Justice Robert Downing of the Illinois Appellate Court and that Justice Downing had previously served as a criminal court judge in the circuit court of Cook County. Mrs. Downing stated, however, that although her husband was a judge, it would not cause her to favor one side or the other, and she assured the court that she could be impartial. The record reveals that defense counsel possessed Bracey's conviction record which showed that in 1970 Judge Downing sentenced Bracey to 12 to 36 years in prison for armed robbery. Despite this fact, no objection was raised to Mrs. Downing being sworn in as a member of the jury, nor was any allegation of prejudice asserted in defendants' written motion for a new trial. The failure to challenge a juror for cause or by preemptory challenge waives any objection to that

juror. [Citation omitted.] Here the jury was duly accepted by the defendants; they cannot now be heard to complain that they were denied a fair trial.

*Collins I,* 478 N.E.2d at 282.

On postconviction appeal, petitioners argued that they were deprived of a fair and impartial jury by Downing's presence on the jury. *See* Postconviction Appellants' Brief 14–16. Although not as specific as the direct appeal brief, in the postconviction appeal petitioners were at least arguing in part the effect of the Judge Downing sentence on the jury in light of Downing's presence on the jury. On the postconviction appeal, the Illinois Supreme Court held:

The defendants first argue that they were deprived of a fair trial and an impartial jury by the presence on the jury of the wife of an appellate court judge who had sentenced one of the defendants in an earlier conviction when the judge was sitting on the circuit court.

During *voir dire,* one of the venirepersons, Dorothy Downing, stated that she was the wife of an Illinois appellate judge sitting in the first district. She also stated that her husband had formerly been a judge on the circuit court of Cook County. When questioned by the trial judge in this matter, Downing stated that the fact that her husband was an appellate judge would have no effect upon her consideration of the defendants' case and that she could be fair and impartial. She was accepted by both counsel as a juror.

No objection was raised to Downing's presence on the jury during trial. However, on direct appeal to this court, the defendants argued her presence on the jury was *per se* prejudicial, requiring that their convictions be set aside. This court concluded that the defendants had waived the issue for purposes of review.

When a defendant has previously taken a direct appeal, all matters which were raised or which could have been raised on that direct appeal are *res judicata* in his subsequent post-conviction proceeding. . . . Although a dissent filed in *Collins I* made essentially the same argument that the defendants are now presenting to this

court (see *Collins*, 106 Ill.2d at 289, 87 Ill.Dec. 910, 478 N.E.2d 267 (Clark, C.J., dissenting, joined by Simon, J.)), we recognize that the majority found the question of Downing's presence on the jury to have been waived by the defendants. Therefore, the issue is *res judicata.* *Collins II*, 180 Ill.Dec. at 63, 606 N.E.2d at 1140.

■ Petitioners presented on direct appeal the issue of permitting Downing to continue on the jury after her husband's role in Bracy's prior conviction had been revealed. This issue was fairly presented as a constitutional claim. Fairly presenting a claim on direct appeal will exhaust a claim and preserve it for federal habeas corpus relief even if the state court fails to expressly address the issue in its opinion. *Smith v. Digmon*, 434 U.S. 332, 333–34, 98 S.Ct. 597, 598–99, 54 L.Ed.2d 582 (1978). On direct appeal, the Illinois Supreme Court considered the issue in terms of allowing Downing to be selected for the jury. *See Collins I*, 478 N.E.2d at 282. Waiver of the continued presence on the jury issue is implied by the facts that (1) there was also no objection raised at the time the Judge Downing sentence was revealed by defense counsel; (2) the state argued that such waiver had occurred; (3) the opinion refers to the lack of "any allegation of prejudice asserted in defendants's written motion for a new trial," *id.;* (4) the dissent reached the issue, *id.,* 478 N.E.2d at 290; and (5) the only aspect of this claim addressed on its merits by the majority is the alleged ineffective assistance of counsel, which does expressly consider Mrs. Downing's continued presence on the jury, *see id.,* 478 N.E.2d at 283.

■ Petitioners seek to invoke the presumption of *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). However, that presumption only applies if the state court addresses the merits of the federal claim, while failing to clearly express reliance on a state default. *See Ylst v. Nunnemaker,*

501 U.S. 797, 802, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991) (quoting *Coleman*, 501 U.S. at 739, 111 S.Ct. at 2559). Here, on direct appeal, the majority did not address the merits of the claim in federal terms. Moreover, even if *Collins I* should be construed as simply failing to address the continuing presence on the jury issue, *Collins II*, 180 Ill.Dec. at 63, 606 N.E.2d at 1140, makes clear the presence on the jury issue was waived for failure to adequately present it to the trial court. Therefore, the continuing presence on the jury issue was defaulted due to failure to object at the time the Judge Downing sentencing evidence was introduced and by failing to adequately present the issue on the motion for a new trial. Thus, the issues regarding Downing's presence on the jury are only preserved as ineffective assistance of counsel claims.[23]

■ In order to succeed on an ineffective assistance of counsel claim, it must be shown both that the attorney's performance was deficient and that the deficiency prejudiced the petitioner. *Lockhart v. Fretwell*, ⸺ U.S. ⸺, ⸺, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993); *Cuppett v. Duckworth*, 8 F.3d 1132, 1135 (7th Cir.1993) (en banc), *cert. denied,* ⸺ U.S. ⸺, 114 S.Ct. 1226, 127 L.Ed.2d 571 (1994); *Patel v. United States*, 19 F.3d 1231, 1235 (7th Cir.1994). It is presumed that counsel performed competently and this presumption can only be overcome by "specific acts or omissions that fell outside the wide range of professionally competent assistance." *Patel,* 19 F.3d at 1235. The prejudice component requires satisfaction of two standards. First, the petitioner must have been prejudiced in the causal sense; there being a sufficient probability that the error affected the outcome. There must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Cuppett,* 8 F.3d at 1136 (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)). Second,

**23.** On the direct appeal, it is indicated that petitioners failed to adequately allege prejudice to support their ineffective assistance of counsel claim. *See Collins I*, 478 N.E.2d at 283. However, the Illinois Supreme Court addressed the merits of the claim without clearly relying on a procedural default. *See id.* Therefore, the *Harris* presumption applies and the Downing ineffective assistance of counsel claims are not procedurally defaulted. Respondents do not contend otherwise. *See* CR 63–66.

even if the reasonable probability standard is satisfied, the prejudice component is not fully satisfied unless "the result of the proceeding was fundamentally unfair or unreliable." *Lockhart*, —— U.S. at ——, 113 S.Ct. at 842. A result will not be fundamentally unfair or unreliable unless the petitioner was "deprived of any substantive or procedural right to which the law entitles him." *Id.*, 113 S.Ct. at 844. *See also Durrive v. United States,* 4 F.3d 548, 551 (7th Cir.1993); *United States v. Springs,* 988 F.2d 746, 749 (7th Cir.1993).

Since allowing Downing to continue on the jury after her husband's prior relationship with Bracy was revealed is more serious than initially permitting her to be on the jury, only the former need be considered. There is no dispute that, as was held by the Illinois Supreme Court, *Collins I,* 478 N.E.2d at 283, the performance of counsel was "an error in judgment." Collins's attorney failed to object to introduction of that evidence. The Illinois Supreme Court held the error did not rise to the level of ineffective assistance of counsel because it held the prejudice component was not satisfied.

The right to a fair and impartial jury is guaranteed by the Sixth Amendment. *Hunley v. Godinez,* 975 F.2d 316, 318 (7th Cir. 1992). The question of Downing's alleged impartiality, therefore, implicates a fundamental right. If a reasonable probability of bias affecting the outcome of the trial can be shown, the fundamental fairness aspect of the prejudice component would be satisfied since the fundamental right to an impartial jury would have been denied.

■■■■ Whether a particular juror was biased generally is a factual question. *Hunley,* 975 F.2d at 318. On habeas review, this court must defer to factual determinations of the state court unless one of the exceptions listed in 28 U.S.C. § 2254(d) is satisfied. *Id.* This, however, does not preclude application of a conclusive presumption of bias where appropriate. *Id.* (quoting *Smith v. Phillips,* 455 U.S. 209, 223, 102 S.Ct. 940, 949, 71 L.Ed.2d 78 (1982)). Whether a juror's partiality may be conclusively presumed from the circumstances is a question of federal law on which this court does not defer to the Illinois courts. *Hunley,* 975 F.2d at 318–19.

■■ Bias will only be presumed in extreme and exceptional circumstances. *Hunley,* 975 F.2d at 319. "[C]ourts have been inclined to presume bias in 'extreme' situations where the prospective juror is connected to the litigation at issue in such a way that is highly unlikely that he or she could act impartially during deliberations." *Id.* The connection may be through a close relative. *See Smith v. Phillips,* 455 U.S. at 222, 102 S.Ct. at 948; *Tinsley v. Borg,* 895 F.2d 520, 528 (9th Cir.1990), *cert. denied,* 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1059 (1991).

■■ No case has been found involving a connection to a judge who had presided over a prior criminal case against a defendant. In one case, the wife of the judge trying the case sat on the jury for that case. Neither the prosecution nor the defendant objected to her being on the jury and there was no evidence of actual bias or effect. The appellate court, however, held that the fundamental right to an impartial jury was violated and that actual prejudice need not be shown. *People v. Hartson,* 160 A.D.2d 1046, 553 N.Y.S.2d 537, 538–39 (1990). This holding relied in part on the interests of the "public at large" in an impartial judicial system, not just the defendant's individual right to an impartial trial. Other cases involving relatives of jurors include the following: *United States v. Bynum,* 634 F.2d 768, 771 (4th Cir.1980) (convictions reversed on ground that one of the jurors, in response to a direct question asked during *voir dire,* had failed to reveal that he had a brother, sister-in-law, and nephew who had been convicted of criminal offenses); *United States v. Eubanks,* 591 F.2d 513, 517 (9th Cir.1979) (court presumed that juror whose sons were currently imprisoned for heroin-related crimes could not remain impartial during heroin conspiracy trial); *United States v. Caldwell,* 543 F.2d 1333, 1347 (D.C.Cir.1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (no presumption of bias because related to police officer); *Brown v. United States,* 356 F.2d 230, 233 (10th Cir.1966) (prejudice could not be presumed by fact that juror in murder trial had a brother who had been murdered); *Scott v. Ball,* 595 So.2d 848, 851 (Miss.1992)

(in civil case, it was not abuse of discretion to refuse to excuse for cause a woman whose son had once been treated by the defendant doctor accused of malpractice); *Herman v. State,* 396 So.2d 222, 227 (Fla.App.), *cert. dismissed,* 402 So.2d 610 (Fla.1981) (bias of grand juror would not be presumed based on fact she was married to head of detective bureau that investigated charged crime). *See also Smith v. Phillips,* 455 U.S. at 222, 102 S.Ct. at 948 (O'Connor, J., concurring) (example of "an extreme situation that would justify a finding of implied bias ... might include ... that the juror is a close relative of one of the participants in the trial or the criminal transaction").

There was no dispute in this case that Bracy had been convicted of armed robbery and previously sentenced on that conviction. Indeed, each defendant had an extensive criminal record. Each defendant brought his criminal record before the jury. There was also no question raised as to the fairness of that prior sentence nor any evidence introduced as to possible sentences that could have been imposed for that conviction. Petitioners contend that Downing can be presumed to have recognized that this was a stiff sentence for armed robbery and therefore would have recognized that her husband had previously determined that Bracy was a bad person deserving of heavy punishment. It is contended that it is highly unlikely that Downing would have been able to put those thoughts aside and fairly evaluate the questions of guilt and punishment. It is also contended that, knowing she was the wife of a judge who had previously sentenced one of the defendants, other jurors may have deferred to her views.

It cannot be held as a matter of law that Downing's knowledge that her husband had previously sentenced Bracy to a lengthy term was highly likely to have influenced her decision. She had no knowledge of the armed robbery case other than the length of sentence imposed. In the case before her, she had lengthy testimony from which to decide the merits. There is no contention that knowledge of prior convictions and sentences thereon are themselves unduly prejudicial in this case. The additional knowledge that one's own husband had presided in one such proceeding does not turn such evidence into evidence that is highly unlikely to permit the juror to remain impartial.

Although, in retrospect, mentioning the name of Judge Downing in connection with one of Bracy's armed robbery sentences was seen to be an error, when that fact is considered together with all other evidence and the other convictions and records of the defendants, its significance pales and was not such as to constitute good cause for discovery and hearing on the effect of such information on the deliberations of the jury.

This court is bound by the factual findings of the Supreme Court of Illinois which are supported by the record. 28 U.S.C. § 2254(d). That court carefully considered the possible impact of the identification of Judge Downing and concluded that what it described as an "error of judgment" was not ineffective assistance of counsel. *Collins I,* 478 N.E.2d at 283. This court agrees. Accordingly, discovery and an evidentiary hearing with respect to this matter is not appropriate.

Bracy Claims III and XVII and Collins Claims VI, VII, and VIII will be denied.

### G. *Ineffective Assistance of Counsel* (B9, B16, C9–12, C27)

Ineffective assistance of counsel is claimed at all stages of the case: pretrial, guilt phase, sentencing phase, on appeal, and postconviction proceedings. Generally, these claims have been addressed in discussing the merits of the underlying error. To the extent they are not expressly discussed, it is because the underlying action was directly addressed and therefore ineffective assistance of counsel in permitting the error to occur need not be separately addressed. Any other ineffective assistance of counsel claims that are not expressly discussed have been waived because never presented to the Illinois courts.

There is no right to counsel in postconviction proceedings and therefore there can be no ineffective assistance of postconviction counsel claim that is cognizable in federal habeas corpus proceedings and the deficiencies of postconviction counsel cannot constitute cause for failure to present other inef-

fective assistance of counsel claims to the Illinois courts. *Coleman*, 501 U.S. at 752–57, 111 S.Ct. at 2566–68; *Jenkins*, 8 F.3d at 508; *Williams v. Chrans*, 945 F.2d at 932–33; *Bonin*, 999 F.2d at 429.

### H. Death Qualified Jurors (B1, C13, C14)

Petitioners complain that the jury was conviction prone because venirepersons who stated they could not impose the death penalty were excluded from the jury. That claim is without merit; such a person may properly be excluded from the jury. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Witherspoon v. State of Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Petitioners also complain that a particular venireperson was excused for cause on the ground that he could not impose the death penalty. Petitioners contend that the record does not adequately support this venireperson being excused.

After equivocating as to whether he could impose the death penalty, the venireperson's questioning finished with the following questions and answers.

Q. [Court] It might be difficult for everybody, but the question is can you do it?

A. I don't know, Your Honor.

Q. Well, we'll have to know whether you can consider it or you would not consider it under any circumstances.

A. Well, I would weigh the circumstances, if that's what you mean. I'd consider it in terms of the evidence.

Q. Well, yes. Certainly. I mean would you consider it?

A. Well, let me put it this way. Again, I'm not one who is in favor of capital punishment.

Q. You don't have to be. If you would consider imposing it, if the circumstances warranted it in the view of you and all the other jurors.

A. Well, if I'm not in favor of capital punishment, I don't see how I could very well, in any circumstance feel comfortable about considering it.

Q. Then, are you saying you could not consider it?

A. That's probably true.

Q. Then you're excused for cause.

Tr. 265–66.

In a capital case, a juror may be excluded for cause if his or her "views would 'prevent or substantially impair' the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424, 105 S.Ct. at 852 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). There is no requirement that a juror's bias be shown with "unmistakable clarity." *Id.*, 469 U.S. at 424–26, 105 S.Ct. at 852–54. As the Supreme Court noted, "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakenly clear;' these veniremen may not know how they will react when faced with imposing the death sentence, or may wish to hide their true feelings." *Id.*, 469 U.S. at 424–25, 105 S.Ct. at 852–53. Additionally, factual findings as to a juror's ability to follow instructions in light of his or her views on capital punishment are findings of fact to which deference is owed pursuant to 28 U.S.C. § 2254(d). *Id.* at 429, 105 S.Ct. at 854.

Here the venireperson was carefully questioned. *See* Tr. 263–66. His responses were equivocal and indicated his doubts as to whether he could participate in deciding a capital case. In the end, he answered that it was "probably true" that he could not consider it. The record supports the state court finding that the venireperson was not capable of applying the death penalty. *See Collins I*, 478 N.E.2d at 286.

Bracy Claim I and Collins Claims XIII and XIV will be denied.

### I. Denial of Continuance for Sentencing Hearing (B11, C15)

The jury returned verdicts of guilty on the evening of July 29, 1981. Petitioners requested a one-day continuance before the sentencing phase began. That motion was denied and a hearing was set for the afternoon of July 30. On July 30, petitioners moved for a two-week continuance. That motion was denied and a hearing was held at which petitioners were found eligible for the

death penalty. The second phase of the death penalty hearing was conducted on July 31. Prosecution witnesses were cross-examined, but no witnesses were presented by either petitioner.

On direct appeal, the Illinois Supreme Court found that petitioners should have been aware prior to trial that the state might seek the death penalty if defendants were convicted. *See Collins I,* 478 N.E.2d at 287. The court also pointed out that, on appeal, petitioners failed to point to any additional evidence that would have been introduced had a continuance been granted. *Id.* In light of these facts, it was held that the trial judge did not abuse his discretion by denying a continuance. *Id.* Bracy also complained that he was not informed until after the trial had begun that evidence of a multiple murder he allegedly committed in Arizona would be used by the state during the sentencing phase. As of the time of his Illinois trial, the Arizona charges were pending, but had not been tried. During the pendency of the Illinois direct appeal, the Arizona charges were tried and Bracy was convicted. On appeal, the Illinois Supreme Court held no prejudice could be shown because, had it reversed on this ground, at the new sentencing hearing the Arizona conviction could be introduced which would be even more conclusive evidence of Bracy's commission of the Arizona murders. *Id.* at 286–87. In the postconviction proceeding, petitioners made the related argument that counsel provided ineffective assistance of counsel by failing to present mitigating evidence. That claim was denied on the ground that petitioners did not point to any mitigating evidence that would have been presented had counsel performed adequately. *Collins II,* 180 Ill.Dec. at 65, 606 N.E.2d at 1142.

 In his federal habeas corpus petition, Collins still fails to point to any mitigating evidence that he would have presented had a continuance been granted or had his counsel been effective. Therefore, his claims must fail for failure to allege any prejudice resulting from the denial of the continuance or from any ineffective assistance of counsel.

*See Bell v. Duckworth,* 861 F.2d 169, 170 (7th Cir.1988), *cert. denied,* 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989); *United States ex rel. Smith v. Lane,* 794 F.2d 287, 291–92, (7th Cir.1986)

Bracy, however, now points to mitigation evidence that he could have presented. He points to alibi witnesses and other exculpatory evidence presented at the Arizona trial. He also points to relatives of Bracy who could have testified to Bracy's difficult childhood and who could have also testified to their love for him and his value as a person. It is also claimed that prison personnel would testify to his model behavior while incarcerated. Bracy's claim requires further discussion.

 The Seventh Circuit has indicated that denial of a continuance could possibly support a due process claim that would be grounds for granting habeas relief. *Bell,* 861 F.2d at 170 ("In some circumstances such a ruling [denying a continuance to prepare for a witness] could be a denial of due process: if the witness was crucial to the prosecution and the defense needed time to develop evidence to counter his testimony."). Other circuits have discussed the issue in greater detail. In order to succeed on a habeas claim based on denial of a continuance, the petitioner must satisfy the ordinary abuse of discretion standard that would apply on direct review and the denial of the continuance must also have rendered the proceeding fundamentally unfair. *Manlove v. Tansy,* 981 F.2d 473, 476 (10th Cir.1992); *Conner v. Bowen,* 842 F.2d 279, 283 (11th Cir.), *cert. denied,* 488 U.S. 840, 864, 109 S.Ct. 107, 164, 102 L.Ed.2d 82, 135 (1988); *Hicks v. Wainwright,* 633 F.2d 1146, 1148 (5th Cir.1981). This analysis must be conducted in light of the need for a continuance and any actual prejudice resulting from the denial of the continuance. *Manlove,* 981 F.2d at 476. Also, resolution of this issue is a mixed question of law and fact; deference is owed to any state court findings of fact.[24] *Manlove,* 981 F.2d at 476.

24. The Eleventh Circuit has held that the question of whether the trial court abused its discretion is to be determined on the basis of the

record before the court as of the time the continuance was denied. *Conner,* 842 F.2d at 283. Seventh Circuit law may allow facts occurring

988

Seventh Circuit law holds that there is no abuse of discretion in denying a continuance· unless the denial was arbitrary and actual prejudice resulted. *United States v. Woods,* 995 F.2d 713, 716 (7th Cir.1993) (quoting *United States v. Withers,* 972 F.2d 837, 845 (7th Cir.1992)). The trial court is entitled to broad discretion on matters of continuances. *Woods,* 995 F.2d at 716; *United States v. Koen,* 982 F.2d 1101, 1114 (7th Cir.1992). This "does not mean no review at all. It simply means that we shall not second-guess the decision of a trial judge that is in conformity with established legal principles and, in terms of its application of those principles to the facts of the case, is within the range of options from which one could expect a reasonable trial judge to select." *Koen,* 982 F.2d at 1114. The following factors are "highly relevant in assessing claims of inadequate preparation time: the quantum of time available for preparation, the likelihood of prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the prosecution." *Id.* (quoting *United States v. Studley,* 892 F.2d 518, 522 (7th Cir.1989)).

Respondent argues that Bracy has waived this claim for federal habeas corpus purposes because he failed to present the facts supporting prejudice to the Illinois courts. If the supporting facts are not adequately presented to the state court, a claim is waived absent a showing of cause and prejudice. *Keeney,* — U.S. at —, 112 S.Ct. at 1719. On direct appeal, Bracy failed to point to the mitigating evidence that he would have presented had a continuance been granted. The death penalty verdict was returned on July 31. Bracy was granted until August 24 to file posttrial motions. Therefore, even if investigation during the trial had not been possible, time was available to develop mitigating evidence that could have been presented in the motions for a new trial. Nevertheless, in his posttrial motion and direct appeal, Bracy failed to point to any additional evidence that he would have presented had he been granted a continuance.

If the record could have been developed for the direct appeal, then Bracy can only succeed on his claim if he can show cause and prejudice for failing to develop the record on direct appeal. *Keeney,* — U.S. at —, 112 S.Ct. at 1721. Such cause and prejudice could be the ineffective assistance of trial and/or .appellate counsel. However, to rely on such cause, that ineffective assistance of counsel claim must have first been fairly presented to the state court. *Murray,* 477 U.S. at 488–89, 106 S.Ct. at 2645–46; *Morrison,* 898 F.2d at 1300. No such claim, however, was fairly presented in the postconviction petition. Therefore, such a claim has not been preserved for use as cause in the present proceeding.

Alternatively, if success on the denial of a continuance claim required the presentation of evidence outside the record, failure to adequately present it on direct appeal would not be a waiver. However, to preserve the claim for federal habeas corpus proceedings, it would have to be presented in the postconviction petition. This claim, however, was not made in the postconviction petition, nor were the facts supporting prejudice alleged in that petition.

Even if Bracy's denial of a continuance claim has not been waived, it would fail on its merits. The record supports the Illinois Supreme Court's finding that counsel should have been aware prior to trial that this case would involve the death penalty. Prior to trial, counsel had the opportunity to speak to Bracy and his family to develop this evidence. There was no need for a continuance in order to have had an opportunity to present this evidence. *Cf. Smith v. Lane,* 794 F.2d at 292. Also, at least some of this evidence could have been prepared between the time the jury began deliberations on the merits and the time that the second phase of the sentencing hearing began. Furthermore, the trial judge was not informed that counsel wanted to develop this type of evidence. It

subsequent to the denial of the continuance to also be considered in determining whether an abuse of discretion occurred. *See United States v. Woods,* 995 F.2d 713, 716 (7th Cir.1993) (all the circumstances, including counsel's performance at trial are to be considered).

was not an abuse of discretion to deny a continuance to develop this information.

Counsel was not informed of the nature of the Arizona charges until the Illinois trial had begun. However, the Illinois Supreme Court notes that Arizona witnesses were listed on a discovery response provided by the prosecution ahead of the trial. The Illinois Supreme Court focused on the prejudice component and held that it was not satisfied because any retrial would permit the introduction of even more damaging evidence, Bracy's actual conviction on the Arizona charges. *See Collins I*, 478 N.E.2d at 286. Bracy argues that the subsequent conviction is irrelevant to whether his trial, that occurred prior to this conviction, was fundamentally unfair. Alternatively, he contends that he still could have attempted to overcome this evidence with the substantial alibi evidence available to show he was in Chicago when the Arizona murders occurred. The subsequent conviction is relevant to determining whether defendant suffered actual prejudice. That a jury has found beyond a reasonable doubt that Bracy committed the Arizona murders supports that it is unlikely that he would have been able to convince the sentencing jury that his participation in those murders had not been proven. Bracy cannot satisfy the actual prejudice component of the denial of continuance claim.

 Bracy still has the related claim of ineffective assistance of trial counsel in failing to present the mitigation evidence. That claim, which was raised in the postconviction proceedings, was denied on the ground that plaintiff failed to adequately demonstrate that any such evidence existed. *Collins II*, 180 Ill.Dec. at 65, 606 N.E.2d at 1142. Having failed to adequately present the facts to the state court, that claim is waived for federal habeas corpus purposes unless cause and prejudice is shown. *Keeney*, —— U.S. at ——, 112 S.Ct. at 1721. Postconviction counsel's ineffectiveness cannot constitute cause. *Coleman*, 501 U.S. at 752–57, 111 S.Ct. at 2566–68; *Jenkins*, 8 F.3d at 508; *Williams v. Chrans*, 945 F.2d at 932–33; *Bonin*, 999 F.2d at 429. Bracy also argues that the state's failure to provide adequate investigatory resources to the *pro bono* counsel representing Bracy in the postconviction proceedings constitutes cause. Just as there is no constitutional obligation to provide postconviction counsel, there is no constitutional obligation to provide such counsel with adequate investigative resources. Additionally, postconviction counsel would have had ready access to Bracy and his relatives. Presumably, he also could have obtained a transcript of the Arizona trial which would have revealed the mitigation evidence that Bracy presently relies upon.[25] Since not adequately presented to the Illinois courts, this ineffective assistance of counsel claim is waived.

For these reasons, Bracy Claim XI and Collins Claim XV will be denied.

### J. Death Penalty Instructions
### (B15, C16–17)

Petitioners claim that the sentencing phase instructions were deficient. However, no claim of error in the instructions was raised on direct appeal and no claim of ineffective assistance of counsel in failing to present such a claim was made in the postconviction petition. Therefore, the claims based on the jury instructions are waived.[26]

 One of the jury instruction claims is that the instructions are inadequate to guide the jury, with 1990 and 1992 studies by Professor Hans Zeisel cited in support thereof.[27] The postconviction petitions were denied by the trial court in 1991, so there apparently

---

25. Also, as to the Arizona murder evidence, the prejudice component of ineffective assistance of counsel would not be satisfied just as the actual prejudice standard for the denial of continuance claim would not be satisfied.

26. In Claim XVI, Collins contends that the instructions as to burden of proof on aggravating and mitigating factors is unconstitutional. Respondent does not contend this claim is waived, instead treating it as a contention that the statute is unconstitutional because it lacks such a re-

quirement, an issue that was raised on direct appeal. *See Collins I*, 478 N.E.2d at 288; CR 76–77. This claim is considered in § III(K) *infra*.

27. Collins indicated in his petition that he would subsequently provide a copy of the studies. C ¶ 737. However, neither party has provided a copy of the studies, which apparently are unpublished.

was an opportunity to present the first study in the postconviction proceedings. Even if this claim is not waived because the studies are newly discovered evidence which could not be presented to the Illinois courts because the time for filing a postconviction petition had already expired, *see Harris v. DeRobertis*, 932 F.2d at 621, the claim would fail. The Seventh Circuit has held that the Zeisel studies do not support a claim upon which habeas relief will be granted and, even if the studies did support a cognizable claim, such a claim would be a new rule for which *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), prohibits retroactive application. *Free v. Peters*, 12 F.3d 700, 703 (7th Cir.1993).

Bracy Claim XV and Collins Claims XVI and XVII will be denied.

### K. Death Penalty Statute Unconstitutional (B12, C18–19, C21)

On various grounds, petitioners contend the Illinois death penalty statute, Ill.Rev. Stat. ch. 38 ¶ 9–1 (1977) (now codified as 720 ILCS 5/9–1) is unconstitutional. Only four grounds [28] were fairly presented to the Illinois Supreme Court. *See Collins II*, 606 N.E.2d at 1142–43. Additional grounds are contained in the federal habeas petitions. As to those grounds, no ineffective assistance of counsel claim was presented to the Illinois courts. Therefore, only the four claims presented to the Illinois Supreme Court have been preserved for federal habeas corpus review.

There is clear authority contrary to the arguments advanced. The Illinois statute does not violate the Constitution by permitting the jury to consider nonstatutory aggravating factors. *Simmons v. South Carolina*, —— U.S. ——, ——, 114 S.Ct. 2187, 2193, 129 L.Ed.2d 133 (1994); *Williams v. Chrans*, 945 F.2d at 939; *Silagy v. Peters*, 905 F.2d 986, 1000–01 (7th Cir.1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). *See also Tuilaepa v. California*, —— U.S. ——, ——, 114 S.Ct. 2630, 2638, 129 L.Ed.2d 750 (1994). The

statute does not violate the Constitution by failing to provide for adequate appellate review. *Silagy*, 905 F.2d at 1000. Nor does the statute violate the Constitution by providing prosecutors with unfettered discretion in pursuing sentences of death. *Williams v. Chrans*, 945 F.2d at 938; *Silagy*, 905 F.2d at 993. The Illinois statute's provisions as to burdens of persuasion and weighing the factors to be considered are not unconstitutional. *See Tuilaepa*, —— U.S. at ——–——, 114 S.Ct. at 2638–39; *Williams v. Chrans*, 945 F.2d at 936–37; *Silagy*, 905 F.2d at 998–99. Additionally, that Illinois law as to the burdens of persuasion may have changed over the years, *see Free*, 12 F.3d at 703, does not support an equal protection claim. *Del Vecchio*, 31 F.3d at 1386; *Bowser*, 20 F.3d at 1065–66.

Bracy Claim XII and Collins Claims XVIII, XIX, and XXI will be denied.

### L. Trial by Judges who accepted Bribes, Discovery (B10, C24, C31)

Judge Thomas Maloney presided over petitioners' trial. In 1993, Judge Maloney was convicted of accepting bribes to acquit certain defendants. *See United States v. Maloney*, 1994 WL 96673 (N.D.Ill. March 23, 1994) (denying posttrial motions). This included accepting bribes in murder cases. Petitioners allege that, in order to cover up the fact that he accepted bribes from defendants in some cases, Judge Maloney was prosecution oriented in other cases, that is he tended to rule in favor of the prosecution, particularly on discretionary matters. Petitioners allege they were prejudiced by this in that many of the discretionary rulings in this case went against them. There is no allegation that Judge Maloney solicited bribes in petitioners' case. In Collins's supplemental motion for discovery, it is also stated that a government witness in the *Maloney* case informed Collins's present counsel that Collins's counsel at the state trial was a partner of Judge Maloney before he sat on the bench.

In a recently filed second supplementary petition, it is also alleged that Judge Michael Close, who presided over petitioners' post-

---

**28.** In the Illinois courts, they were presented as five grounds, but two of the grounds were found to be inverse statements of the same ground. *See Collins II*, 606 N.E.2d at 1143.

conviction proceedings, has accepted bribes from defendants. It is alleged that the "allegations of improprieties concerning Judge Close must call into question whether or not proper discretionary rulings were made in Petitioner's case." C ¶ 820. There is no allegation that Judge Close solicited bribes from petitioners.

■ Respondents contend that these claims were waived because not presented to the Illinois courts. The claim regarding Judge Maloney was raised for the first time in the reply brief of the postconviction appeal, which is when it first became public information. The Illinois Supreme Court declined to consider the claim. That the Maloney claims are based on newly discovered information constitutes cause for failing to raise it sooner. *See Murray,* 477 U.S. at 488, 106 S.Ct. at 2645. At the time the new information was first discovered, the time for filing a postconviction petition had already expired. *See* 725 ILCS 5/122–1. There being no direct precedent that the Illinois courts would excuse the delay, it is presumed that no remedy was still available in state court at the time the new evidence was discovered. *Harris v. DeRobertis,* 932 F.2d at 621. Cause exists for failing to present the Judge Maloney claim to the state courts.

■ The Judge Close claim is different. The allegations of Judge Close's corruption incorporate newspaper articles. *See* C ¶ 820. As one of those articles states, the allegations against Judge Close first surfaced in 1985. That was before petitioners even filed their postconviction petitions. Therefore, cause does not exist for the delay in raising the Judge Close claim. *Cf. Cornell,* 976 F.2d at 380–81. That claim is waived.

■ The constitutional right to a fair trial includes the right to a trial judge who is neutral, detached, and free from bias. *Dyas v. Lockhart,* 705 F.2d 993, 995 (8th Cir.1983). Petitioners do not contend that bias can be presumed from the available facts. Instead, they argue that they need further discovery in order to obtain facts that would show the existence of actual bias. It is unclear how petitioners would make such a showing. At oral argument, it was suggested they would

seek to prove Judge Maloney was tougher in cases where bribes were not paid. That, however, would be insufficient and is only a matter of speculation. As petitioners concede, they are presently incapable of succeeding on the Judge Maloney claims. They do not point to any particular adverse ruling that would have been favorable to them before another judge. Their attack is similar to the position of the petitioner with respect to possible bias of a trial judge rejected by the Court of Appeal, *en banc,* in *Del Vecchio,* 31 F.3d at 1372 (Easterbrook, J., concurring at 1388–91). The present allegations contain insufficient specificity or good cause to justify further discovery. *Cf. Deputy v. Taylor,* 19 F.3d 1485, 1493 (3d Cir.1994); *Munoz v. Keane,* 777 F.Supp. 282, 287 (S.D.N.Y.1991).

Bracy Claim X and Collins Claims XXIV and XXXI will be denied. Collins's supplemental motion for discovery is also denied.

### M. Fabricated Rope Evidence (C25)

Collins claims that police reports indicate only one piece of rope was recovered from the apartment where the victims had been held. C ¶ 784. However, at trial, two pieces of rope were introduced into evidence. Petitioner contends one or both pieces of rope was fabricated evidence. There is no allegation that the police reports were unavailable at the time of trial. This claim was not presented to the Illinois courts, either directly or as an ineffective assistance of counsel claim. This claim is waived for federal habeas corpus purposes. Collins Claim XXV will be denied.

### N. Severance (C26)

Collins complains that the trial court denied his motion to sever his sentencing hearing from that of Bracy. This argument is waived because not raised on direct appeal and no related ineffective assistance of counsel claim was raised in the postconviction proceedings. Collins Claim XXVI will be denied.

### O. Nowell Impeachment Evidence (C28)

It is alleged that the prosecution failed to provide petitioners with information that could have been used to impeach Nowell. This issue was not raised in the Illinois courts and there is no allegation that knowl-

**992**

edge of the additional impeachment was not discoverable until after the time for filing a postconviction petition had run. Petitioners, therefore, fail to show cause for failing to present this claim to the Illinois courts. The claim is waived. Collins Claim XXVIII will be denied.

### P. Brady Claim Related to Nellum (C30, C37)

 Collins alleges that, in May 1993, he first obtained a copy of a January 28, 1981 police report that had not been provided to petitioners at the time of the trial. At that point, it was too late to file a postconviction claim, so petitioners would have cause for failing to present to the Illinois courts any issue based on the police report. Collins contends that this information would be *Brady* information that should have been disclosed by the prosecution. *See Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "A *Brady* violation occurs where the prosecution suppresses evidence that is favorable to the defendant and material to an issue at trial." *United States v. Carson,* 9 F.3d 576, 582 (7th Cir. 1993). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Dweck,* 913 F.2d 365, 371 (7th Cir.1990) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985))).

Collins alleges that the report contains two pieces of material information. First, he alleges that it refers to only one piece of rope being found, not two. However, in Collins Claim XXV, *see* § III(M) *supra,* it is alleged that reports revealed there was only one piece of rope. There is no allegation that petitioners lacked access to these other reports at the time of trial. Therefore, having this fact included in an additional report cannot be considered a material fact, nor are the reports necessarily inconsistent as written.

It is also alleged that a report reveals that Morris Nellum's fingerprints were found in Apartment 206 when it was searched on December 30, 1980. Apartment 206 was where the murder victims were held prior to being taken out to be shot. The fingerprint evidence would have supported petitioners' contention at trial that Nellum frequented Apartment 206. Nellum denied he lived there. This evidence would not necessarily establish impeachment. Nellum admitted that he had been in the apartment on and before November 12, 1980, and that a person by the name of Iron Mike lived there. However, even if the evidence would have resulted in additional impeachment of Nellum (who petitioners now accept as truthful) it could not be said to have an effect on the outcome of the trial.

Collins Claims XXX and XXXVII will be denied.

### Q. Punishment Alternatives and Dangerousness (C32–36)

In a third supplemental petition, Collins raises claims regarding the issue of punishment alternatives and future dangerousness of he and Bracy.[29] It is complained that the prosecution made an argument that defendants would be a continuing danger to society if not put to death, but that the trial court refused to permit Bracy's counsel to point out that defendants would get life imprisonment without parole if not sentenced to death. This issue is raised substantively, as ineffective assistance of counsel at each level of the state court proceeding, and as an equal protection claim on the ground that other Illinois defendants have been permitted to point out that they would be subject to life imprisonment without parole. Since the issue of dangerousness (including related ineffective assistance of counsel or equal protection claims) was never presented to the Illinois Supreme Court, these claims are all waived.

 Even if considered on their merits, these claims would fail. In a recent Supreme Court case, the prosecution had made arguments that the defendant would be a danger to the *community* if not executed. The

---

29. This claim was also alluded to in the original petition. *See* C ¶¶ 478, 480, 483.

death sentences were vacated because the trial court had denied defendant's attempts to inform the jury that absent a death sentence, he would be sentenced to life without parole. *See Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In the present case, the prosecution argued that petitioners would be dangerous to others at the *prison* or *if they escaped from prison* (Tr. 1649–50, 1653); there was never any argument that they would represent a danger if released or paroled from prison. Therefore, being a danger because released on parole was not an issue raised by the prosecution. Also, although the court sustained an objection to Bracy's counsel's reference to petitioners getting natural life or life imprisonment if not sentenced to death, Tr. 1636–37, no objection was made to Collins's counsel's statement that Collins would not be back out on the street in 5 to 10 years if not sentenced to death. Tr. 1642.

Since 1988, Illinois provides for jury instructions as to natural life imprisonment being the alternative to the death penalty, *see People v. Gacho,* 122 Ill.2d 221, 119 Ill. Dec. 287, 306–07, 522 N.E.2d 1146, 1165–66, *cert. denied,* 488 U.S. 910, 109 S.Ct. 264, 102 L.Ed.2d 252 (1988). However, this change in practice does not result in an equal protection violation, *see Del Vecchio,* 31 F.3d at 1386; *Bowser,* 20 F.3d at 1065–66.

Collins Claims XXXII, XXXIII, XXXIV, XXXV, and XXXVI will be denied.

### R. Involuntary Confession (B7)

At trial, Bracy was impeached with statements he made to police officers that he had been in the vicinity of Apartment 206 on November 12, 1980. Bracy now alleges that this statement to the police was involuntary in that he was beaten by the police. This claim was not raised in the state courts. Ineffective assistance of trial counsel cannot be cause because this ineffective assistance of counsel claim has not been presented to the state courts. *Murray,* 477 U.S. at 488–89, 106 S.Ct. at 2645–46; *Morrison,* 898 F.2d at 1300. Ineffective assistance of postconviction counsel cannot constitute cause. *Coleman,* 501 U.S. at 752–57, 111 S.Ct. at 2566–68;

*Jenkins,* 8 F.3d at 508; *Williams v. Chrans,* 945 F.2d at 932–33; *Bonin,* 999 F.2d at 429. Bracy also relies on Nellum's recent deposition testimony as cause because it purportedly contains new evidence in that Nellum states he saw Bracy being beaten. However, Bracy himself would have known he was beaten, so Nellum's evidence was not needed in order to be able to know the facts necessary to bring the claim.

There being no cause for failing to present the claim to the state courts, Bracy Claim VII will be denied.

### S. Impeachment with Silence (B8)

Bracy complains that he was impeached with the fact that, while being interrogated by an assistant State's Attorney, he had not stated that he spent the evening of the murders with his sister. Bracy contends that this constitutes a violation of his right to remain silent. This claim was not presented to the Illinois Supreme Court. Bracy contends that the ineffective assistance of appellate counsel constitutes cause. However, this ineffective assistance of appellate counsel claim was not fairly presented in his postconviction appeal. Therefore, it cannot constitute cause, *see Murray,* 477 U.S. at 488–89, 106 S.Ct. at 2645–46; *Morrison,* 898 F.2d at 1300, and Bracy Claim VIII is waived.

Bracy Claim VIII will be denied.

### T. Loss of the Common Law Record

▇ Petitioners' postconviction attorney withdrew the common law record from the trial and has not returned it to the courts.[30] This court has ordered postconviction counsel to search for the record, and a rule to show cause is pending as to postconviction counsel. However, he has been unable to locate the missing record. The common law record has been partially reconstructed.

Petitioners refer to the possibility that finding the common law record could reveal additional errors that have not yet been raised. While it might reveal additional errors for petitioners to allege, it is not shown how it would reveal any errors on which relief could be granted. Petitioners have the briefs filed on the direct appeal. Any errors

---

**30.** The common law record from the postconviction proceedings is not missing.

not raised on direct appeal would be waived absent cause and prejudice. Since any additional errors that might be revealed by the common law record were not raised in the form of ineffective assistance of counsel claims in the postconviction proceedings, the cause standard would not be satisfied. *See Murray,* 477 U.S. at 488–89, 106 S.Ct. at 2645–46; *Morrison,* 898 F.2d at 1300.

In any event, the burden is on petitioners to show they are prejudiced by the missing records. *See Bransford v. Brown,* 806 F.2d 83, 86 (6th Cir.1986), *cert. denied,* 481 U.S. 1056, 107 S.Ct. 2198, 95 L.Ed.2d 853 (1987). Mere speculation about the potential for finding error is insufficient. *Cf. id.* Moreover, it is petitioners' own counsel who lost the record. He is petitioners' agent and they must bear the risk of that attorney's error. *Coleman,* 501 U.S. at 752–56, 111 S.Ct. at 2566–67.

IT IS THEREFORE ORDERED that:

(1) Petitioner Collins is granted leave to file three supplemental habeas corpus petitions in Case No. 93 C 5282. Petitioner's supplemental motion for discovery in Case No. 93 C 5282 [72–1] is denied. Petitioner's motions to order production of exhibits [60–1] and for protective order [61–1] in Case No. 93 C 5282 are denied.

(2) Respondent's motion to dismiss is granted.

(3) Petitioner's motion to conduct discovery in Case No. 93 C 5282 is denied.

(4) The Clerk of the Court is directed to enter judgment in favor of respondent and against petitioner denying the petitions for writ of habeas corpus in Case No. 93 C 5282.

(5) Respondent's motion to dismiss in Case No. 93 C 5328 is granted.

(6) Petitioner's motion to conduct discovery in Case No. 93 C 5328 is denied.

(3) The Clerk of the Court is directed to enter judgment in favor of respondent and against petitioner denying the petition for writ of habeas corpus in Case No. 93 C 5328.

## MEMORANDUM OPINION AND ORDER ON MOTIONS TO ALTER OR AMEND

In the Circuit Court of Cook County, Illinois, Roger Collins and William Bracy were found guilty of murder and other charges and were sentenced to death. The convictions and sentences were affirmed on direct appeal and post-conviction relief was denied. In an order dated August 24, 1994 (the "August Order"), their federal petitions for writ of habeas corpus were denied. Pending are each petitioner's motion to alter or amend the judgment.[1] Also pending is Collins's motion for approval of expenditure of funds to conduct further discovery. The facts of the case are set forth in the August Order and familiarity with that opinion is assumed. Most of petitioners' contentions simply repeat arguments that have previously been considered and rejected. Only new arguments or arguments that were not sufficiently addressed in the August Order will be discussed.

■■■ Collins contends in his brief that this court's reading of the entire transcript was insufficient to determine the sufficiency of the evidence because the court did not have the trial exhibits as well. When the motion was presented in court, counsel was asked what the missing exhibits were and was allowed time to provide them for the court's review. At the time the motion was presented in court, counsel referred to one photograph and stated that the exhibits were in the custody of the Cook County State's Attorney. No copy of that photograph nor any other exhibit was filed within the time allowed. The transcript was understandable without the exhibits and Collins does not point to any exhibit for which actual examination is necessary to determine the sufficiency of the evidence. The ruling on sufficiency of the evidence will stand.

■■■ Collins has filed a request for approval of funds for his attorneys to travel to Arizona to directly examine documents accumulated by a private investigator for Bracy. The private investigator has primarily been investigating Arizona murder charges

1. Collins's supplement to his motion has also been considered.

against Bracy, but also has information related to the Illinois charges against Bracy and Collins. Some of this information was previously considered. *See* August Order §§ III(B), III(L). Collins provides a statement of the types of documents the private investigator has. Most of it apparently relates to the Arizona charges. While generally describing the documents, Collins makes no specific allegations as to what facts could support a ground for relief. Collins has not shown good cause for permitting further discovery. *Cf. DeLong v. Thompson,* 790 F.Supp. 594, 616–18 (E.D.Va.1991), *aff'd by unpublished order,* 985 F.2d 553 (4th Cir. 1993).

Collins's motion for discovery also contains a transcript of May 1994 testimony of Attorney Greg Owen in the case of *Arizona v. McCall.* Owen was one of the prosecutors in the present case. Collins again points to inconsistencies regarding when Nellum informed the prosecutors of guns being in the lake. These inconsistencies, however, came out at trial. As was previously held, they do not constitute grounds for relief. *See* August Order § III(C).

█ Collins contends that it was recently discovered that Nellum had one or two prior convictions that were unknown to petitioners at the time of trial. The prior convictions were mentioned at a June 1991 sentencing hearing on other charges against Nellum. Collins does not explain how this alleged newly discovered evidence would support a claim upon which habeas relief could be granted. Newly discovered evidence that supports a person's innocence is not alone a basis for granting habeas relief. Deprivation of the evidence must also be a constitutional violation. *Herrera v. Collins,* — U.S. —, —, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993); *Bowman v. Armontrout,* 859 F.Supp. 369, 372 (W.D.Mo.1994). Furthermore, newly discovered impeachment evidence will not support habeas relief. *Bowman,* 859 F.Supp. at 372. There is no contention that the prosecution knew of these convictions at the time of the trial. This allegation of newly discovered evidence does not support a claim.

█ Collins now clarifies that he is claiming that there is one police report indicating that only one piece of rope was recovered from the apartment where the victims had been held and that this report was not turned over at the time of trial. *See* August Order § III(M). But even assuming the recent discovery of the police report constitutes cause for failing to present this claim to the Illinois courts, there is no reasonable probability that petitioners could have both shown that the rope evidence presented at trial was fabricated and that such a showing would have resulted in their being found not guilty. Relief would not be granted on this new allegation.

All other issues raised in Collins's motion to alter or amend and the issues raised in Bracy's motion to alter or amend are adequately addressed in the August Order.

IT IS THEREFORE ORDERED that:

(1) In 93 C 5282, Collins's motion to alter or amend [85–1,2] and sealed motion for approval of expenditure of funds [91–1] are denied.

(2) In 93 C 5328, Bracy's motion to alter or amend [58–1,2] is denied.

Dated: November 4, 1994.